# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Student DOE #1, Student DOE #2, Student DOE #3, Student DOE #4, Student DOE #5, and Student DOE #6, <br><br>   *Plaintiffs*, <br><br> v. <br><br> Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security, Todd LYONS, Acting Director, U.S. Immigration and Customs Enforcement, Ricky J. PATEL, in his official capacity as Newark Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcement, and John TSOUKARIS, in his official capacity as Newark Field Office Director, Enforcement and Removal Operation, U.S. Immigration and Customs Enforcement, <br><br>   *Defendants*. | Case No. 25-cv-02998-KSH-AME |

# PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION .............................................................................................. 1

PROCEDURAL HISTORY .................................................................................. 1

SUPPLEMENTAL FACTUAL BACKGROUND ...................................................... 4

ARGUMENT ..................................................................................................... 12

I.      The Court Should Restore the *Status Quo Ante* to Prevent Imminent,
        Irreparable Harm. ................................................................................. 13

II.     Notice to Plaintiffs in Advance of Any Re-Termination is Necessary
        Given the Likelihood of Unlawful Re-Termination of Plaintiffs'
        Records. ................................................................................................. 19

        A.      Defendants Unlawfully Terminated Plaintiffs' SEVIS Records. ...... 21

        B.      DHS Has Shown it is Likely to Again Target Plaintiffs for
                Termination of SEVIS Records and F-1 Status. ................................. 22

        C.      Given Plaintiffs' Property and Liberty Interests At Stake, Due
                Process Necessitates Notice and an Opportunity to Be Heard
                Prior to Re-Termination of Their SEVIS Records. ............................. 29

CONCLUSION .................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Association of Univ. Professors v. Rubio*,
    --- F. Supp. 3d ---, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ....................25

*Ariz. Student DOE 2 v. Trump*,
    No. 4:25-cv-00175 (D. Ariz.) ...............................................................................8

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgt., LLC*,
    793 F.3d 313 (3d Cir. 2015) ...............................................................................13

*Board of Curators of Univ. of Missouri v. Horowitz*,
    435 U.S. 78 (1978)........................................................................................30, 33

*Boardman v. Pac. Seafood Grp.*,
    822 F.3d 1011 (9th Cir. 2016) ...........................................................................13

*Borrell v. Bloomsburg University*,
    955 F.Supp.2d 390 (M.D. Pa. 2013)..................................................................31

*Canal Auth. of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) .............................................................................14

*City of Mesquite v. Aladdin's Castle, Inc.*,
    455 U.S. 283 (1982)...........................................................................................20

*Dee v. Borough of Dunmore*,
    549 F.3d 225 (3d Cir. 2008) ..............................................................................32

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland
    Sec.*, 108 F.4th 194 (3d Cir. 2024)...............................................................13, 18

*Doe v. Noem,*--- F.Supp.3d ----, 2025 WL 1141279 (W.D. Wash. Apr.
    17, 2025) .............................................................................................................16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................................20

*Goss v. Lopez*,
    419 U.S. 565 (1975)........................................................................................30, 33

*Hernandez v. Gonzales*,
   437 F.3d 341 (3d Cir. 2006) ...................................................................29

*Independent News Co. v. Williams*,
   404 F. 2d 758 (3d Cir. 1968) .................................................................20

*Ireland v. Hegseth*, No. 25-CV-01918, 2025 WL 1084239 (D.N.J.
   Mar. 24, 2025) ......................................................................................16

*Jane Doe 1 v. Bondi*, No. 1:25-cv-01998 (N.D. Ga. May 2, 2025) .......................16

*J.G.G. v. Trump*,
   --- F.Supp. 3d ----, 2025 WL 1119481 (D.D.C. Apr. 16, 2025),
   *appeal docketed*, No. 25-5124 (D.C. Cir. Apr. 17, 2025) ..................................23

*J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*,
   287 F.3d 267 (3d Cir. 2002) ...................................................................13

*Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*,
   935 F.3d 172 (3d Cir. 2019) ...................................................................30

*Kadakia v. Rutgers*,
   633 F. App'x 83 (3d Cir. 2015) ...............................................................33

*Keles v. Bender*,
   No. 17-1299, 2021 WL 568105 (D.N.J. Feb. 16, 2021)................................31, 33

*Liu v. Noem*, --- F.Supp.3d ----. 2025 WL 1233892 (D.N.H. Apr. 29,
   2025) ...............................................................................................16, 17

*Mathews v. Diaz*,
   426 U.S. 67 (1976)................................................................................29

*Mudric v. Attorney General*,
   469 F.3d 94 (3d Cir. 2006) .....................................................................30

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018) .....................................................................14

*National Council of Nonprofits v. Office of Management and Budget*,
   --- F.Supp.3d ---, 2025 WL 597959 (D.D.C. 2025), *appeal
   docketed*, No. 25-5248 (D.C. Cir. Apr. 25, 2025) ...........................................15

*Noem v. Abrego Garcia,*
    604 U.S. ----, 145 S.Ct. 1017 (2025) ................................................24

*Ortho Pharm. Corp. v. Amgen, Inc.*,
    882 F.2d 806 (3d Cir. 1989) ...................................................14, 18

*Regents of the Univ. of Michigan v. Ewing*,
    474 U.S. 214 (1985)................................................................31

*Ross v. Pennsylvania State University*,
    445 F.Supp. 147 (M.D. Pa. 1978)................................................31

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024)................................................................13

*U.S. v. Article of Drug Designated B-Complex Cholinos Capsules*,
    362 F.2d 923 (3d Cir. 1966) ....................................................19

*U.S. v. Oregon State Medical Soc.*,
    343 U.S. 326 (1952)................................................................20

*U.S. v. W.T. Grant Co.*,
    345 U.S. 629 (1953)................................................................20

*In re Uranium Antitrust Litig.*,
    617 F.2d 1248 (7th Cir. 1980) ..................................................14

*W.B. v. Noem*,
    No. 25-cv-3407, 2025 WL 1180296 (N.D. Cal. Apr. 23, 2025) ......................32

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)................................................................29

**Regulations**

8 C.F.R. § 214.1(d) ................................................................21, 30

8 C.F.R. § 214.1(g) ................................................................30

8 C.F.R. § 214.2(f) ................................................................30

8 C.F.R. § 241.1(g) ................................................................21

## Constitutional Provisions

U.S. Const. amend I ........................................................................25

U.S. Const. amend V............................................................17, 21, 24, 29

## Other Authorities

ABC News, FULL TRANSCRIPT: Trump's exclusive 100 days
    broadcast interview with ABC News (Apr. 29, 2025),
    https://abcnews.go.com/US/full-transcript-trumps-exclusive-100-
    days-broadcast-interview/story?id=121291672....................................24

Alexandra Berzon, et al., *Social Security Lists Thousands of Migrants
    as Dead to Prompt Them to 'Self-Deport'*, N.Y. Times (Apr. 10,
    2025), https://www.nytimes.com/2025/04/10/us/politics/migrants-
    deport-social-security-doge.html .........................................................25

JD Vance (@JDVance), X (Apr. 15, 2025),
    https://x.com/JDVance/status/1912320489261027374 .....................23

Lauren Irwin, *Homan on Deportation Flights: "I Don't Care What
    the Judges think"*, The Hill (Mar. 17, 2025),
    https://thehill.com/homenews/administration/5198604-border-czar-
    trump-deportation/ ................................................................................22

Liam Knox, *ICE Expands Student Deportation Powers*, Inside Higher
    Ed (May 2, 2025),
    https://www.insidehighered.com/news/global/international-
    students-us/2025/05/02/new-ice-policy-puts-international-students-
    greater ...................................................................................................27

Meet the Press - May 4, 2025, NBC News (May 4, 2025),
    https://www.nbcnews.com/meet-the-press/meet-press-may-4-2025-
    n1312074...........................................................................................22, 23

Nate Raymond, *Trump Administration to Restore Foreign Students'
    Legal Status, For Now*, Reuters (April 25, 2025),
    https://www.reuters.com/world/us/trump-administration-restore-
    foreign-students-legal-status-now-2025-04-25/ ..................................26

Tony Dokoupil and Caitlin Yilek, *Kristi Noem Says If Kilmar Abrego Garcia Was Sent Back to U.S. "We Would Immediately Deport Him Again"*, CBS News (Apr. 30, 2025), https://www.cbsnews.com/news/kristi-noem-kilmar-abrego-garcia-trump-deport/. ...................................................................................................24

## INTRODUCTION

Plaintiffs submit this brief in further support of their Motion for a Temporary Restraining Order. In particular, as the Court requested, Plaintiffs here provide additional evidence and explanation of the imminent, irreparable harms that they face until they are restored to the *status quo ante*—that is, until their records in the Student and Exchange Visitor Information System ("SEVIS") are fully restored to eliminate all record of their unlawful and arbitrary termination. (Supplemental Factual Background and Part I.) Plaintiffs also write to further explain the need for notice prior to any re-termination of their SEVIS records. (Part II.) Given the information set forth below, as well as Plaintiffs' supplemental declarations, the Declaration of Elizabeth Goss, and the supporting documents filed herewith, Plaintiffs request that the Court grant a Temporary Restraining Order that mirrors the terms of this Court's Order dated April 29, 2025, ECF 25, with an additional term requiring Defendants to immediately (i.e., within 72 hours) restore Plaintiffs' SEVIS records to the *status quo ante,* striking all text and/or data within SEVIS (and any systems populated with data from SEVIS) that refer to the unlawful termination of Plaintiffs' SEVIS records or F-1 status.

## PROCEDURAL HISTORY

On April 22, 2025, Plaintiffs – five international students enrolled at Rutgers University and one recent Rutgers graduate – filed this action and an Emergency

Motion for a Temporary Restraining Order ("TRO Motion"). ECF Nos. 1, 2. Counsel for Plaintiffs provided counsel for Defendants advance notice that temporary restraints were being sought and emailed stamped copies of substantive docket entries shortly after they were filed. ECF Nos. 1-3, 8.

On April 23, 2025, the Court entered a text order setting a briefing schedule and ordering that "[p]ending further order of the Court, defendants are enjoined from transferring plaintiffs out of this Court's jurisdiction, or taking them into custody or arresting or detaining them." ECF No. 10.

Pursuant to the briefing schedule, Defendants filed a brief in opposition to the TRO Motion on April 24. ECF No. 13. On April 25, Plaintiffs filed a letter on the docket to apprise the Court of two developments (1) that three Plaintiffs' records had been reactivated and (2) that media outlets were reporting that an attorney for the Government made statements on the record in another matter that U.S. Immigration and Customs Enforcement ("ICE") was "developing a policy that will provide a framework for SEVIS terminations." ECF No. 14. Plaintiffs argued that these developments did not address their concerns or mitigate the need for temporary restraints. *Id*. Shortly afterward, Plaintiffs filed their reply brief in support of their TRO Motion. ECF No. 15 ("TRO Reply"). The Court then ordered a status/scheduling conference for 3:00 p.m. on April 28. ECF No. 16.

At the April 28 conference, counsel for Plaintiffs advised the Court that ICE had reactivated all of Plaintiffs' records, but that such reactivation did not address continuing harms and that they still sought temporary restraints. Apr. 28 Hr. Tr. 6:21-7:16. The Court ordered that its April 23 text order, ECF No. 10, remain in effect and ordered the parties to confer on a proposed order addressing temporary restraints. ECF No. 21. The Court further ordered that if the parties could not agree to a proposed order by 12:00 p.m. on April 29, they should appear in person at 3:00 p.m. ECF No. 21.

On April 29, Plaintiffs filed a letter on the docket advising the Court that the parties could not come to any agreement on temporary restraints, and attached their proposed order. ECF No. 23. The Court subsequently held a hearing, and counsel for Defendants represented that they would "not agree to any constraints on the government's ability to act in the immigration sphere." Apr. 29 Hr. Tr. 11:12-14. After reviewing Plaintiffs' requests, the Court entered an Order that included certain interim restraints to maintain the status quo pending further proceedings, set a supplemental briefing schedule, and scheduled a hearing for Wednesday, May 7, at 10:00 a.m. to address the open issues, *i.e.*, Plaintiffs' requests that SEVIS records be fully restored to eliminate all record of their termination, and to require notice prior to any re-termination of their SEVIS records, ECF Nos. 24-25. Specifically, the Order continued the April 23 text order (ECF No. 10), further directed Defendants

to "not directly or indirectly enforce, implement, or otherwise impose any consequences arising out of . . . [the record terminations] without 30 days' written notice," and required Defendants to provide Plaintiffs with 30 days' notice before re-terminating these Plaintiffs' records. ECF No. 25 ¶¶ 1-3. This brief and supporting documents are filed pursuant to the Court's request for further briefing in support of their request for a TRO. Apr. 29 Hr. Tr. 30:13-16.

## SUPPLEMENTAL FACTUAL BACKGROUND

Between April 3 and April 8, 2025, ICE abruptly and without notice terminated Plaintiffs' SEVIS records, effectively stripping Plaintiffs of their F-1 student status. Compl. ¶¶ 6, 42, 46. Plaintiffs were successfully maintaining that status at the time of termination and had not engaged in any behavior that would have subjected them to termination; ICE had no authority to terminate their records. Compl. ¶¶ 43, 54. These terminations imposed emergent harm, including: the immediate termination of students' employment authorization, rendering Plaintiffs unable to work and creating financial crises for some Plaintiffs and their families, Compl. ¶ 56; effectively precluding Plaintiffs from continuing and completing their course of study, including original research that is central to completing their graduate degrees, Compl. ¶ 59; preventing students from reentering the United States on their F-1 visas should they depart, and stripping students of any evidence of lawful status, Compl. ¶¶ 47, 58; and rendering students vulnerable to ICE arrest,

detention, and deportation, causing immense fear and anxiety, Compl. ¶ 57. Plaintiffs' prior briefing and the declarations submitted therewith set out the panoply of irreparable harms they experienced in the immediate aftermath of their SEVIS terminations. *See* ECF Nos. 1, 2-1, 3, 15.[1]

As the Court is aware, the records for all six Plaintiffs have since been returned to "active status." *See* Second Linhorst Decl. Ex. A ("Event History" pages in Plaintiffs' SEVIS records). However, as Defendants agree, the case is not moot. Apr. 29 Hr. Tr. 6:9-12. Indeed, Plaintiffs still face irreparable harm. The Court therefore provided Plaintiffs the opportunity to "mak[e] a showing" that Plaintiffs require the restoration of their SEVIS records to the *status quo ante,* striking all text referring to the unlawful termination of Plaintiffs' records in April, on an emergent basis. Apr. 29 Hr. Tr. 26:20-23.

Plaintiffs' SEVIS records – which the Department of State's Foreign Affairs Manual ("FAM") describes as the "definitive record[s] of student or exchange visitor status," 9 FAM 402.5-4(B) – still reflect the unlawful terminations executed in early April, as well as the vague, unindividualized, and misleading explanations for the

---

[1] Plaintiffs executed second declarations in support of this supplemental briefing, that are cited herein and illustrate the ongoing irreparable harms caused by the remaining notations in their SEVIS records. They also provide further insight into the fallout of the original SEVIS terminations, which wreaked havoc on their academic pursuits, employment, and personal lives. *See* Student Does ##1-6 Second Declarations.

unlawful terminations. Specifically, each Plaintiffs' SEVIS record retains annotations that their SEVIS record was "terminated" for a period of approximately three weeks, as well as the annotation accompanying that termination entry which states "Individual identified in criminal records check and/or has had their VISA revoked." *See* Second Linhorst Decl. Ex. A (SEVIS Records). In addition, four Plaintiffs' records still contain the notation "FAILING TO MAINTAIN STATUS" next to a prior termination. *Id*. Because of these remaining notations in their records, Plaintiffs continue to face the following imminent and irreparable harms:

- ***Ongoing harm to their reputations, academic and career prospects, and earning potential***, based on the facts that their SEVIS records state that they have failed to maintain status and suggest that they have committed a criminal offense that warranted revoking their visa and F-1 status. *See* Second Linhorst Decl. Ex. A. *See also* Student Doe #1 Second Decl. ¶ 15 ("Since April 5, 2025, I have not been able to plan for a future. This violation and gap based on criminal history are in my record now. Every day my decisions are laced with worry that it will come up. This is all making me feel numb – the uncertainty about what will come of the investment I've made of my money, my time, and my young adult life has left me despondent and sad."), ¶ 14 ("It will be a red flag if I am not permitted to complete my experiential learning in the U.S. successfully,

especially if I cannot get a visa here because of this . . . ."); Student Doe #6 Second Decl. ¶ 12 ("In my line of work, working with power systems, I will likely need a background check for any employment, and I am worried about what will come up in those checks. Previously I have not had any issues because my only arrest has been dismissed and expunged, but the current notation in my SEVIS record actually suggests that I have a criminal record, which I do not.")

- ***Constraints on their freedom to travel abroad to visit their families and increased risk that they will be unable to reenter the United States after any international travel,*** due to the likelihood that the information noted on their records will be used to prevent them from reentering or subject them to detention. *See* Goss Decl. ¶ 21 ("[T]he derogatory SEVIS record history will likely trigger scrutiny by Customs and Border Protection including secondary inspection when a student arrives at a port of entry for inspection and admission by CBP."); Student Doe #1 Second Decl. ¶¶ 11-12 (describing having to cancel plans to visit their family because they "do not know whether or when it will be safe" to visit them, and being forced "to decide between fulfilling my goal of pursuing my degree in the United States and risking it all to see my family"); Student Doe #2 Second Decl. ¶ 7 ("But now that my SEVIS record has a termination period with a

notation that I have a criminal record, I am extremely fearful of leaving and returning to the United States. I am aware that Customs and Border Protection can deny my entry to the United States and I am afraid that I will be denied because of the notation in my record . . . I fear that I will have to choose between visiting my family in China and continuing my education. I feel that my entire education and future is at risk if I visit home, and I do not know that I will take that chance."); Student Doe #3 Second Decl. ¶ 14 ("I don't feel comfortable traveling internationally because I am worried that I will be denied entry to the U.S. because of the gap in my SEVIS record."); Student Doe #5 Second Decl., ¶ 9 (explaining that international travel plans are "completely out the window with my SEVIS record having a termination period and criminal record notation. I am too fearful of exiting and re-entering the United States, and being denied entry or detained," and "now that my SEVIS record has a termination period, I am fearful that I am no longer safe in the United States and cannot leave and re-enter"); Student Doe #6 Second Decl. ¶ 14 ("I had been delaying travelling outside the United States since December 2024 to visit my parents, which is now delayed indefinitely . . . I am even scared to travel domestically, as I do not know if I will be detained[.]").

- ***A heightened risk of re-termination of SEVIS Records and F-1 Status, and of being targeted for detention and removal.*** An ICE or DHS employee would be able to see their past termination in the SEVIS system, and other agencies may as well. *See* Goss Decl. ¶ 21 ("There is every reason to believe that this information will cause various agencies to flag these Plaintiffs in future dealings, given the criminal and immigration violations identified as the basis for termination."). This would threaten Plaintiffs' liberty and again disrupt their graduate education, research studies, and related employment. *See* Student Doe #1 Second Decl. ¶ 10 ("Will the inaccurate negative history [in my SEVIS record] be used against me? Can I travel internationally? Will visiting my family abruptly end my career in the United States? How should I know how to act? My mind is spinning out of control."); Student Doe #5 Second Decl. ¶ 8 ("Even though my SEVIS record is now marked as 'Active,' I continue to feel very scared for my safety. I feel I must be extremely cautious in all my day-today activities. I feel afraid when I do a task as simple as driving.").

- ***A risk of future immigration harm due to the gap in their SEVIS records, including not being able to change to another immigration status*** nor adjust to lawful permanent residency. *See* Goss Decl. ¶ 20 ("Any attorney that represents nonimmigrants knows that it is critical their records are as

9

clean as possible. It is very likely that derogatory history like this will have imminent and/or long-term impacts on students' ability to remain in the country, maintain their F-1 student status, obtain OPT/STEM OPT, affect a transfer to another nonimmigrant status, return to the United States after travel abroad, and adjust their status.").

- ***Interference with their ability to participate in Optional Practical Training ("OPT") or, for F-1 students in STEM fields, to extend their OPT period***. *See* Goss Decl. ¶ 23 (explaining that it is unclear if USCIS will honor records of students who have a "gap" when applying to OPT); Student Doe #1 Second Decl. ¶¶ 7-8 (explaining that their OPT work authorization expires in July and while they had planned to file for an extension in April, "I am worried that USCIS will deny my request for an extension because of the termination and reported criminal history/visa revocation, and that once it is denied, I will lose any chance of re-applying. But soon, I will have no choice but to apply because I have bills to pay, and I need to continue working to support myself"); Student Doe #3 Second Decl. ¶ 16 ("I am worried that the gap in my SEVIS record will result in a denial of a future student visa or OPT. Prior to my SEVIS termination, I felt like I had a clear five-year plan. Now, I can't even plan one year ahead. I am living day-to-day, and it is making it hard to plan my

future personally and professionally."); Student Doe #4 Second Decl. ¶ 13 ("Prior to my SEVIS record termination, I felt confident about my academic career. I was not worried about finishing my PhD and then pursuing OPT. Now, I am afraid that the gap in my record will negatively impact my ability to get OPT."); Student Doe #6 Second Decl. ¶ 12 ("I am not sure if I will be able to secure OPT or CPT now that I have a termination in my record, especially since it notes that I was identified in a criminal records check.").

- ***Ongoing Violations of Plaintiffs' Due Process Rights***, which amount to irreparable harm as a matter of law. *See* TRO Reply at 4; *infra* Part II.

- ***Ongoing Stress and Anxiety Arising from the Notations in their SEVIS Records and the Harms Described Above***. *See, e.g.*, Student Doe #1 Second Decl. ¶ 9 ("How am I supposed to plan for any type of future when the government suddenly terminated my SEVIS record, when I was complying with the terms of my status, and I do not know if they will do it again?"); Student Doe #2 Second Decl. ¶ 8 ("I feel very uneasy and uncertain that the government will take away my student status in some other way. I have dedicated so much time and effort to my education, and to contributing to scientific research, that I do not understand how it can be taken from me so abruptly."); Student Doe #4 Second Decl. ¶ 12 ("I

11

continue to feel so stressed about my immigration status and it is hard to focus on my academic work. When I heard that ICE plans to create a new 'framework for status termination,' I felt very worried that my SEVIS record could be impacted again."); Student Doe #5 Second Decl. ¶ 8 ("I used to think I would be protected by the Constitution while studying in the U.S., but now I no longer feel like I have rights since my status was terminated without due process."); Student Doe #6 Second Decl. ¶ 3 ("I read in national news articles that the government was going to look for a different way to deport us. Once again there is fear and worry hanging over my head."), ¶ 9 ("I am plagued with an underlying worry that my SEVIS record could be terminated again and how it will impact my future."). The fear and uncertainty created by the Plaintiffs' experience and the risk of re-termination of SEVIS records has also delayed one Plaintiff's plans to start a family. *See* Student Doe #3 Decl. ¶ 15 (describing their difficult decision to put off starting a family with their spouse because while their spouse had planned to adjust from F-1 to F-2 derivative status to accommodate a "focus on building our family," "we had to change our plan when my SEVIS was terminated, because we are no longer confident that I will be able to continue my F-1 status, or that she would be granted an F-2" which "has been a tremendous stress for both of us").

These harms are irreparable. See Br. Supp. TRO Mot. 26-29; TRO reply 1-4; *infra* at 15.

## ARGUMENT

The Court should require Defendants to take the simple steps necessary to address the imminent and irreparable harms and legal consequences described above. Because these harms emanate from the continued existence of the notations within Plaintiffs' SEVIS records indicating that their records had been terminated, and that a criminal record search may have triggered the termination, Defendants should be required to delete any mention of the terminations from Plaintiffs' records.

**I.     The Court Should Restore the *Status Quo Ante* to Prevent Imminent, Irreparable Harm.**

A TRO is "a 'stay put,' equitable remedy that has as its essential purpose the preservation of the status quo while the merits of the cause are explored through litigation." *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (quotation marks omitted). Likewise, the primary purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (quotation marks omitted); *see also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024) ("The goal is to ensure that, at the end of the case, the court can still grant an adequate remedy."). Whether in a TRO or a preliminary injunction, the "status quo" that this Court must seek to preserve in

13

fashioning an equitable remedy is not the status quo *after* a defendant has completed the wrongdoing that precipitated the lawsuit, but the *status quo ante* or *status quo ante litem* – "the last, peaceable, noncontested status of the parties." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgt., LLC*, 793 F.3d 313, 218 (3d Cir. 2015) (quoting O*pticians Ass'n of Am. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)); *see also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (referring to the *status quo ante litem* as "the last uncontested status which preceded the pending controversy") (internal quotation marks omitted); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1259 (7th Cir. 1980) ("[A] preliminary injunction seeks to preserve the status quo ante litem[.]"); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018) ("This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing.").

Importantly, preliminary injunctive relief "need not be limited to restoring the parties precisely to their pre-litigation position without regard to the irreparable injury that movant faces. If the existing 'status quo' is currently causing one of the parties irreparable injury . . . , then it is necessary to alter the situation to prevent the injury." *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 814 (3d Cir. 1989); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("The

purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. . . . The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.").

Here, as discussed *supra*, Defendants recently altered the status quo by terminating Plaintiffs' SEVIS records, including by adding a highly prejudicial annotation of criminality. They have since activated Plaintiffs' SEVIS records but have not restored the *status quo ante* because these terminations and annotations remain in Plaintiffs' SEVIS records, continuing to cause the irreparable harm listed *supra*.

As discussed in prior TRO briefing, these harms are irreparable. *See* TRO Motion at 26–29 (discussing irreparable harm arising from academic and financial losses, risk of detention and deportation, and the immigration law impact of a gap in record of lawful F-1 status); TRO Reply Br. at 1–4, 7–8 (discussing the same and also the irreparable harm arising from the violation of due process rights). The supplemental declarations further clarify that plaintiffs are in highly specialized and advanced fields of study, and that the disruption of their academic research or employment at this critical time of their careers may make it impossible for them to complete their graduate degrees or progress to employment in their fields of specialty, and drastically alter their future career paths. *See, e.g.*, Student Doe #2

Second Decl. ¶¶ 5-6 (describing how their inability to go to the lab for 24 days while their SEVIS record was terminated "severely impacted" their cancer research, which involves time-sensitive work with mice, and that they were forced to terminate certain experiments and sacrifice dozens of mice); Student Doe #4 Second Decl. ¶¶ 6-8 (explaining how their SEVIS record termination caused them to miss valuable time in the lab, such that they will need to start some experiments anew, they will be required to renew their onboarding process, and, as a result of these delays, they fear they will not have enough data to defend their thesis in August as planned). In addition to the cases cited previously, recent decisions in similar cases from other districts recognize that disruption and delay in academic programs can amount to irreparable harm. *See, e.g., Jane Doe 1 v. Bondi*, No. 1:25-cv-01998, ECF No. 43, slip op. at 26 (N.D. Ga. May 2, 2025) ("The loss of timely academic progress alone is sufficient to establish irreparable harm."); *Liu v. Noem*, --- F.Supp.3d ----. 2025 WL 1233892 at *11 (D.N.H. Apr. 29, 2025) ("This delay and threat to Liu's ability to complete his Ph.D. program cannot be redressed and constitute irreparable harm in light of the facts of this case."); *Doe v. Noem*, --- F.Supp.3d ----, 2025 WL 1141279 at *8 (W.D. Wash. Apr. 17, 2025) (holding that plaintiff would suffer irreparable harm because he "is currently unable to continue in his academic work, and should that condition persist, he faces loss of grants and an inability to complete his degree"). Likewise, Plaintiffs' reputational harm is also irreparable. *See Ireland*

16

*v. Hegseth*, No. 25-CV-01918, 2025 WL 1084239 at *3 (D.N.J. Mar. 24, 2025) (holding that plaintiffs, transgender men in the Air Force who were forced to take administrative absence, would face irreparable harm for damage to their careers and reputations).

Moreover, for international students with family overseas, the risk of not being able to reenter the United States following travel abroad means that if their records are not fully restored, they will face the choice between two sets of irreparable harms: either they risk abandoning their academic careers in the United States or they face prolonged separation from their families. *See, e.g.*, Student Doe #1 Second Decl. ¶ 12 (feeling forced "to decide between fulfilling my goal of pursuing my degree in the United States and risking it all to see my family"); Student Doe #2 Second Decl. ¶ 7 ("I fear that I will have to choose between visiting my family in China and continuing my education. I feel that my entire education and future is at risk if I visit home, and I do not know that I will take that chance.").

Notably, while financial losses may not be irreparable in all contexts, they are here. Plaintiffs neither seek nor are "able to recover monetary damages." *Liu*, 2025 WL 1233892 at *11. As the district court in New Hampshire recently held, "[t]he APA does not waive the government's sovereign immunity with regard to a claim seeking money damages. § 702. And monetary damages are unavailable for Fifth Amendment violations brought against federal officials in their official capacity." *Id*.

Thus, "[e]conomic losses such as [a plaintiff's] loss of stipend can be considered irreparable harm because [the plaintiff] has no adequate remedy at law to recover for [their] damages." *Id*. (collecting cases) (holding that "the economic losses stemming from Liu's inability to work as a research assistant or receive his stipend if his F-1 student status remains terminated constitute irreparable harm"). *See also* Student Doe #3 Second Decl. ¶ 13 ("I couldn't get on the waitlist to be a Teaching Assistant for next fall because the selection for the waitlist happened when my status was terminated. This lost opportunity will affect me both financially and professionally, because Teaching Assistant positions are a valuable way to get teaching experience in my field, and also earn a stipend."); Student Doe #4 Second Decl. ¶ 11 ("The termination of my SEVIS record has resulted in a great financial burden to me. In order to pay my bills while my work was suspended, I had to sell my furniture and my bicycle, and I limited all driving and social activities to reduce my daily expenses.").

While reactivating Plaintiffs' SEVIS records is an important step, it is not sufficient to restore Plaintiffs to the *status quo ante* – or to prevent or put a stop to these irreparable injuries. Nor can such relief await the end of a trial on the merits, since irreparable harm would occur in the meantime. Indeed, without a preliminary injunction restoring the *status quo ante*, Plaintiffs may end up outside the United States and unable to reenter long before such a trial has occurred, all because of the

original unconstitutional actions of Defendants. *See Ortho Pharm. Corp.*, 882 F.2d at 814; *Del. State Sportsmen's Ass'n*, 108 F.4th at 201 (emphasizing that preliminary injunctions serve to preserve "the court's ability to decide the case [and] to give meaningful relief"). The injunctive relief sought should be granted.

## II.    Notice to Plaintiffs in Advance of Any Re-Termination is Necessary Given the Likelihood of Unlawful Re-Termination of Plaintiffs' Records.

In recent months, the Department of Homeland Security and ICE have shown a complete disregard for due process, both in this and other cases involving the termination of SEVIS records and more generally. *See infra* Part II(A). Moreover, ICE has unfortunately made clear that its decision to reactivate the SEVIS records of Plaintiffs and other students whose records appear to have been terminated in the same nationwide operation does not reflect any decision to abandon Defendants' blatantly unlawful effort to remove a large number of international students from American soil. Rather, it appears to foreshadow another broad-scale attempt to arbitrarily and unjustly terminate the F-1 status of international students. For these reasons, the Court should require Defendants to provide at least 30 days' notice to Plaintiffs and their counsel prior to any attempt to re-terminate Plaintiffs' SEVIS records or F-1 status, or take any other action, including initiating removal

proceedings for any reason, that would subject Plaintiffs to a risk of immigration detention or deportation.[2]

As a threshold matter, the fact that Defendants have reactivated Plaintiffs' SEVIS records does not preclude Plaintiffs from seeking injunctive relief to address the risk of unlawful re-termination. "It is well settled that the cessation of activities, either before or after suit is begun, does not in itself bar issuance of the injunction. The matter is in the broadest sense for the discretion of the trial court which is best qualified to form a judgment as to the likelihood of a repetition of the offense." *U.S. v. Article of Drug Designated B-Complex Cholinos Capsules*, 362 F.2d 923, 928 (3d Cir. 1966). Indeed, the Supreme Court has warned courts "to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *U.S. v. Oregon State Medical Soc.*, 343 U.S. 326, 333 (1952). Thus, where preliminary relief is sought against a practice that has been voluntarily stopped, the trial court "may consider many factors, such as the likelihood of repetition."

---

[2] Plaintiffs reserve their right to amend the Complaint should it become necessary to address particular ways this could be accomplished, including through visa revocation, an issue that is not currently before the Court.

*Independent News Co. v. Williams*, 404 F. 2d 758, 761 (3d Cir. 1968). This is precisely such a case. [3]

### A.    Defendants Unlawfully Terminated Plaintiffs' SEVIS Records.

As explained in Plaintiffs' Complaint and prior TRO briefing, Defendants terminated Plaintiffs' SEVIS records with complete disregard for applicable law and regulations, including 8 C.F.R. § 214.1(d), the Administrative Procedure Act, and the Fifth Amendment Due Process Clause. More information that has come to light in the past week fully corroborates the allegations in Plaintiffs' Complaint and details the reckless manner in which Defendants have recently terminated SEVIS records. In particular, the April 29, 2025, testimony of Andre Watson, an Assistant Director at ICE, at a hearing in *Patel v. Lyons*, No. 1:25-cv-01096-ACR in the

---

[3] As well, courts apply the "voluntary cessation" doctrine to circumstances where defendants attempt to convince courts that their ceasing of the challenged practices deprive the court of jurisdiction to issue an injunction, and hold that the fact that defendants have stopped the challenged practice does "not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id.*, quoting *City of Mesquite*, *supra*, citing *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). *See also National Council of Nonprofits v. Office of Management and Budget*, --- F.Supp.3d ---, 2025 WL 597959 (D.D.C. 2025), *appeal docketed*, No. 25-5248 (D.C. Cir. Apr. 25, 2025) (applying these principles to enjoin the freeze of federal funds in accordance with several of the President's executive orders, even though the Office of Management and Budget's memorandum that had ordered the freeze had been rescinded).

District Court of the District of Columbia provides insight into the termination process. Second Linhorst Decl. Ex. B ("Watson Tr."). Watson testified that, "at the instruction of leadership" at DHS, on or around April 1 of this year, employees at ICE engaged in what DHS called the "student criminal alien initiative" which involved running the names of all 1.3 million noncitizen students in the United States through the National Crime Information Center ("NCIC") database to find matches. Watson Tr. at 5:12–9:11. ICE employees found approximately 6,400 matches between NCIC and SEVIS, put the names of these 6,400 students onto spreadsheets, and sent them to the Department of State ("DOS"). *Id*. at 11:15–13:3. DOS officials then revoked the visas of approximately 3,000 students listed on these spreadsheets and instructed ICE officials to terminate the SEVIS records of others, and ICE officials instructed SEVP to terminate thousands of SEVIS records. *Id*. at 13:25–14:12, 15:13–17:16. This "student criminal alien initiative" was carried out extremely quickly and, according to Watson, was never put into writing. *Id*. at 5:12–22.

Watson did not deny that the NCIC database includes records of all kinds of individuals who have had contacts with the criminal justice system, whether missing persons, crime victims, or people charged with an offense, regardless of the severity or outcome, *id*. at 5:23–6:24. It is by no means a list of individuals convicted of crimes, let alone of the "crimes of violence" that would lawfully trigger termination

22

of a student's F-1 status under status under 8 C.F.R. § 241.1(g). *See* Compl. ¶¶ 41

n.16, 62 n.31. And yet merely based on matches between NCIC and SEVIS, with no

apparent individualized review, Watson's team at ICE effectively terminated the F-

1 status of thousands of students, causing immediate, severe, and – unless addressed

– irreparable harms. Moreover, they marked their SEVIS records with a false and

harmful notation suggesting both criminality and failure to maintain status, knowing

that these students were, in fact, lawfully in status and had done nothing to warrant

termination of their F-1 status. Watson Tr. at 27:3-18, 33:22–34:2.

> **B.    DHS Has Shown it is Likely to Again Target Plaintiffs for Termination of SEVIS Records and F-1 Status.**

In recent months, DHS has taken other actions that disregard the rule of law

in general and principles of due process in particular. High level officials charged

with carrying out immigration policies have shown outright disdain for the rule of

law. In promising to continue to carry out deportations to the Salvadoran mega-

prison, "Border Czar" Thomas Homan was quoted as saying "I don't care what the

judges think. I don't care." Lauren Irwin, *Homan on Deportation Flights: "I Don't*

*Care    What    the    Judges    think"*,    The    Hill    (Mar.    17,    2025),

https://thehill.com/homenews/administration/5198604-border-czar-trump-

deportation/. Both President Trump and Vice President Vance have publicly

denounced basic principles of due process for noncitizens facing deportation. *See,*

*e.g.,* Meet the Press - May 4, 2025, NBC News (May 4, 2025), https://www.nbcnews.com/meet-the-press/meet-press-may-4-2025-n1312074 (quoting President Trump as saying he "do[es]n't know" if noncitizens deserve due process and acknowledging that the Fifth Amendment "might say that, but if you're talking about that, then we'd have to have a million or two million or three million trials. . .. And I was elected to get them the hell out of here, and the courts are holding me from doing it."); JD Vance (@JDVance), X (Apr. 15, 2025), https://x.com/JDVance/status/1912320489261027374 (referring to process for noncitizens facing deportation as "fake legal process").

Moreover, the United States District Court for the District of Columbia found probable cause to believe that President Trump and defendant agency heads – including Defendant Kristi Noem – acted in criminal contempt when they willfully disregarded both an oral and written Temporary Restraining Order prohibiting the transfer of "two planeloads of passengers protected by the TRO into a Salvadoran mega-prison." *J.G.G. v. Trump*, --- F.Supp. 3d ----, 2025 WL 1119481 at *1, (D.D.C. Apr. 16, 2025), *appeal docketed*, No. 25-5124 (D.C. Cir. Apr. 17, 2025). DHS has unlawfully effectuated the removal of at least one man to the same notorious Salvadoran prison who had been granted withholding of removal to El Salvador because of the persecution he would face if returned. *Noem v. Abrego Garcia*, 604 U.S. ----, 145 S.Ct. 1017, 1018 (2025) ("The United States acknowledges

24

that Abrego Garcia was subject to a withholding order forbidding his removal to El Salvador, and that the removal to El Salvador was therefore illegal. The United States represents that the removal to El Salvador was the result of an 'administrative error.'"). Although admitting that that the U.S. could effectuate the return of Kilgar Armando Ábrego García if it wanted to, the government has failed to take steps to do so. ABC News, FULL TRANSCRIPT: Trump's exclusive 100 days broadcast interview with ABC News (Apr. 29, 2025), https://abcnews.go.com/US/full-transcript-trumps-exclusive-100-days-broadcast-interview/story?id=121291672 (quoting President Trump's admission that he could call President Bukele to seek Mr. Garcia's return and stating that "if he were the gentleman that you say he is, I would do that"). And Defendant Noem has stated that even if Mr. Ábrego García were returned to the United States, DHS "would immediately deport him again." Tony Dokoupil and Caitlin Yilek, *Kristi Noem Says If Kilmar Abrego Garcia Was Sent Back to U.S. "We Would Immediately Deport Him Again"*, CBS News (Apr. 30, 2025), https://www.cbsnews.com/news/kristi-noem-kilmar-abrego-garcia-trump-deport/.

Beyond its disregard for due process, and contempt for the rule of law, the federal government has also demonstrated a pattern of weaponizing technology and government databases to sloppily target noncitizens, subvert due process, and undermine other constitutional protections. Recently, the purported Department of

Government Efficiency ("DOGE") abused the Social Security Administration's database to mark thousands of immigrants as "dead" to cause them to "self-deport." Alexandra Berzon, et al., *Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport'*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/us/politics/migrants-deport-social-security-doge.html. *See also American Association of Univ. Professors v. Rubio*, --- F. Supp. 3d ---, 2025 WL 1235084 at *5 (D. Mass. Apr. 29, 2025) (recognizing plausible claims that the government's "ideological-deportation policy" violates the First Amendment based in part on plaintiffs' evidence of "a new social media surveillance program called 'Catch and Revoke' which deploys artificial intelligence to find evidence to support visa revocations"). A similar abuse of technology and data appears to be at the center at the recent student SEVIS terminations. As described *supra* Part II(A), Assistant Director at ICE Andre Watson explained the agency's reliance on NCIC to identify students to target through its "student criminal alien initiative," despite admitting that the database includes records of people who have been arrested but not charged or convicted, missing persons, and people with driving infractions. Watson Tr. at 5:23–6:24.

The examples above do not inspire confidence that Defendants will refrain from repeating their unlawful actions here, and they certainly do not suggest that Plaintiffs will be afforded procedural due process if and when they attempt to. Nor,

given these facts, is it at all speculative to conclude that DHS will not suddenly demonstrate respect for the rule of law upon which our democracy depends.

ICE itself has established a likelihood that the harm of terminating Plaintiffs' SEVIS records will be repeated. Although counsel for Defendants did not introduce it into the record, at the hearing in this matter on April 28, 2025, Plaintiffs were shown a statement from ICE that announced: "ICE is developing a policy that will provide a framework for SEVIS record terminations. . . . ICE maintains the authority to terminate a SEVIS record for other reasons. . ." Second Linhorst Decl. Ex. C. This statement was consistent with a statement made on the record on April 25, 2025, during a hearing in a similar federal lawsuit brought by another student whose SEVIS records were terminated. *See* Nate Raymond, *Trump Administration to Restore Foreign Students' Legal Status, For Now*, Reuters (April 25, 2025), https://www.reuters.com/world/us/trump-administration-restore-foreign-students-legal-status-now-2025-04-25/ (quoting an email received by Judge F. Dennis Saylor stating that ICE is "developing a policy that will provide a framework for SEVIS record terminations").

The document was also misleading, failing as it did to reveal that some form of a draft policy had already been drafted, two days earlier. Specifically, a document dated April 26, 2025, and titled Broadcast Message: SEVIS Notice – Policy Regarding Termination of Records, filed in the District of Arizona by Defendants

Noem, Lyons, and others, illustrates that Plaintiffs remain at risk of unlawful and unconstitutional SEVIS/F-1 terminations and removal attempts. *See* Second Linhorst Decl. Ex. D (copy of filing at ECF No. 13-1 in *Ariz. Student DOE 2 v. Trump*, No. 4:25-cv-00175 (D. Ariz.)). While the legal import of this document is uncertain given the lack of formal rulemaking and notice of this policy, it evidences at the very least an intent on the part of ICE to resume terminating SEVIS records and providing information to DOS that will trigger removal. It notes that DOS can "consider derogatory information provided by ICE" in deciding to revoke a visa, and directs that if DOS "revokes an alien's visa with immediate effect, ICE should take steps to initiate removal proceedings," and "SEVP may terminate the nonimmigrant's SEVIS record based on the visa revocation with immediate effect[.]" *Id*. at 2. This "Broadcast Message: SEVIS Notice – Policy Regarding Termination of Records" thus appears to change existing DHS policy, under which visa revocation is not grounds for SEVIS termination. *See* Compl. ¶ 51 n.23 (explaining that under existing DHS policy guidance, visa revocation is not cause for termination of a SEVIS record). *See also* Liam Knox, *ICE Expands Student Deportation Powers*, Inside Higher Ed (May 2, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/05/02/new-ice-policy-puts-international-students-greater (noting ICE is claiming "inherent authority" to terminate F-1 status, and describing how the policy

creates "vague" justifications for records terminations, including visa revocations by DOS, "which can be issued without evidence of a violation."). If implemented, the policy described in the Broadcast Memo "would enshrine broad permission for ICE to begin deporting students practically at will" and would create "a legal landscape in which ICE could begin deportation proceedings with impunity." *Id.*

> C.    **Given Plaintiffs' Property and Liberty Interests At Stake, Due Process Necessitates Notice and an Opportunity to Be Heard Prior to Re-Termination of Their SEVIS Records.**

It is well-established that noncitizens are protected under the Fifth Amendment's Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (stating that "the Due Process clause applies to all persons within the United States, including [noncitizens] whose presence here is lawful, unlawful, temporary, or permanent"); *Hernandez v. Gonzales*, 437 F.3d 341, 345 (3d Cir. 2006) ("[Noncitizens] within the United States may not be deprived of liberty or property without due process.") (citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976)).

"It is axiomatic that a cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie." *Mudric v. Attorney General*, 469 F.3d 94, 98 (3d Cir. 2006). Here, Plaintiffs have a property interest both in their F-1 status and in their continued education, which would be lost (again) if ICE unlawfully re-terminates their SEVIS records.

Once a student is admitted into the United States on an F-1 student visa and enters F-1 status, statutes expressly limit the circumstances under which a student's F-1 status can be terminated. Students will remain in status so long as they abide by the requirements enumerated in the regulations governing their visa classification in 8 C.F.R. § 214.2(f). ICE does not, then, have unfettered discretion to terminate students' F-1 status by terminating SEVIS records. *See* 8 C.F.R. § 214.1(d) (laying out the three scenarios in which ICE can terminate F-1 student status); *see also Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019). Accordingly, Plaintiffs have a property interest in their F-1 status, which is reflected in their SEVIS records and allows them to continue pursuing their degrees and engaging in authorized employment.

Plaintiffs also have a property interest in continuing their graduate education. The Supreme Court has assumed that there is a property interest in higher education, *see Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 80 (1978); *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985), and has explicitly recognized such an interest in state-created public secondary school systems, *Goss v. Lopez*, 419 U.S. 565 (1975). *See also Ross v. Pennsylvania State University*, 445 F.Supp. 147, 152-53 (M.D. Pa. 1978) (concluding that under state law, the student "had a property interest in the continuation of his education as a graduate student"); *Keles v. Bender*, No. 17-1299, 2021 WL 568105 at *8-*10 (D.N.J. Feb. 16, 2021)

(conducting a full due process analysis of plaintiff student's entitlement to be enrolled in a PhD program, while acknowledging that whether a state actor had deprived him of a recognized property interest was "not at issue in [the] motion"). Further, "[c]ourts in the Third Circuit have repeatedly recognized that a graduate student has a property interest protected by procedural due process in the continuation of his or her course of study under Pennsylvania law." *Borrell v. Bloomsburg University*, 955 F.Supp.2d 390, 402 (M.D. Pa. 2013).

In addition to their property interests, Plaintiffs have also articulated liberty interests at stake in this case. Plaintiffs not only have a liberty interest in freedom from physical arrest and detention, TRO Reply at 7-8, but also have a liberty interest in their reputation that is implicated by their SEVIS record terminations, TRO Reply at 8. As explained *supra* Part I, Plaintiffs face ongoing harm because of the remaining notations in their SEVIS records, which indicate that they were out of status because they may have been "identified in a criminal records check." Since only serious crimes of violence constitute a failure to maintain F-1 status, 8 C.F.R. § 214.1(g), and none of the Plaintiffs have been convicted of such an offense, these notations are especially misleading and harmful to Plaintiffs' reputations. Subsequent terminations, particularly with such vague language concerning alleged criminal conduct, may likewise have a reputational impact. *See* Goss Decl. ¶ 21 ("That derogatory information can be accessed by other governmental agencies and

departments including DOS, CBP, and USCIS. There is every reason to believe that this information will cause various agencies to flag these Plaintiffs in future dealings, given the criminal and immigration violations identified as the basis for termination.").While reputation alone is not an interest protected by the Due Process Clause, a plaintiff can "make out a due process claim for deprivation of a liberty interest in reputation" if the plaintiffs can "show a stigma to his reputation plus deprivation." *Dee v. Borough of Dunmore*, 549 F.3d 225, 233-34 (3d Cir. 2008) (finding that because the student had a property interest in not being suspended, that was a sufficient "plus" to make out a due process argument on the basis of a liberty interest) (internal quotation marks omitted). In at least one of the pending cases examining the abrupt termination of SEVIS records without notice, a court has found "a colorable claim for a violation of Plaintiff's liberty interest in her SEVIS registration." *W.B. v. Noem*, No. 25-cv-3407, 2025 WL 1180296 at *5 (N.D. Cal. Apr. 23, 2025) ("The inaccurate [SEVIS] record has now, at minimum, created stigma to Plaintiff's personhood and legal status, and has resulted in the loss of the ability to maintain employment and legal status. Plaintiff has thus been wrongly classified and suffered a concrete harm as a result. There is thus at least a serious question whether her due process rights have been violated.").

Given their property and liberty interests, Plaintiffs require basic process prior to Defendants re-terminating their SEVIS records and, thus, their F-1 status. "The

essence of a procedural due process claim, of course, is notice and an opportunity to be heard." *Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015). In ascertaining the minimum process that is due, the Court can look to cases challenging student disciplinary processes: thus, when public schools seek to suspend students, the U.S. Supreme Court has ruled that schools must provide "oral or written notice of the charges against [the student] and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story provide oral or written notice." *Goss*, 419 U.S. at 581 ("The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school."). *Goss* requires an "'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Horowitz*, 435 U.S. at 85-86 (quoting *Goss*, 419 U.S. at 584). *See also Keles*, 2021 WL 568105 at *10 (finding procedural due process requirements met because the student was "put on notice of, and had multiple communications with Rutgers about, the Ph.D. requirements," and "was given the opportunity to be heard through the give-and-take he had with various faculty and staff at Rutgers").

When ICE terminated Plaintiffs' SEVIS records in early April, thereby terminating their F-1 status, the agency failed to provide any notice,[4] and offered no opportunity to be heard whatsoever. *See* Compl. ¶ 55; TRO Motion at 24-26. Due process demands much more. At the very least, given the significant harms that take effect immediately upon SEVIS termination and loss of status, Compl. ¶¶ 2, 9, 42, 46, 56-59, Plaintiffs should receive notice and an opportunity to be heard a reasonable period of time *prior* to termination. To ensure that Defendants do not run roughshod over Plaintiffs' rights as they did in April, Plaintiffs require intervention from this Court to ensure that Defendants provide 30-days' notice of any intent to re-terminate Plaintiffs' SEVIS records and the opportunity for Plaintiffs to "make any appropriate application to the Court." ECF No. 25.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant a Temporary Restraining Order that mirrors the terms of this Court's Order dated April 29, 2025, ECF 25, with an additional term requiring Defendants to immediately (i.e., within 72 hours) restore Plaintiffs' SEVIS records to the *status quo ante,* striking all text and/or data within SEVIS (and any systems populated with data from SEVIS) that refer to the unlawful termination of Plaintiffs' SEVIS records or F-1 status.

---

[4] One Plaintiff received an email with minimal information from ICE SEVP, stating that the student's OPT authorization period had ended, the same day she received notice from Rutgers of the SEVIS termination. Student Doe #1 Decl. ¶ 13.

Date: May 5, 2025                  Respectfully submitted,

/s/ Lawrence S. Lustberg
Lawrence S. Lustberg

**Gibbons P.C.**
John J. Gibbons Fellowship in
Public Interest and Constitutional Law
Lawrence S. Lustberg, Esq.
Ruth O'Herron, Esq.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com
roherron@gibbonslaw.com

**American Civil Liberties Union
of New Jersey Foundation**
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
(973) 854-1715
jlocicero@aclu-nj.org

**Rutgers Immigrant Community
Assistance Project (RICAP)**
Center for Law and Justice
Jason Hernandez*
Jessica Rofe**
Leena Khandwala
123 Washington Street
Newark, New Jersey 07102

*Attorneys for Plaintiffs*

*\* application for admission forthcoming*

*\*\* pro hac vice motion pending*

35