**Declaration of Elizabeth Goss, Esq.**

I, Elizabeth A. Goss, declare the following under pain and penalty of perjury:

**Background**

1. I am over 18 years of age and am fully competent to make this declaration. I have over 25 years of experience as a licensed immigration attorney. I earned my Juris Doctor in 1999, received bar admission in Massachusetts (1999) and New York (2000) and have practiced immigration law since that time. I am also admitted in the U.S. District Court for the District of Massachusetts.

2. Prior to practicing law, I was a Designated School Official ("DSO")/ Responsible Officer ("RO") at Tufts University. As an institution certified by the government to enroll international students, Tufts is required to designate school officials, or DSOs, to manage and update nonimmigrant student records. As a DSO, I advised students enrolled in F-1 status at the University regarding maintenance of their nonimmigrant status and supported timely and complete recordkeeping and reporting to the Immigration and Naturalization Services ("INS"), the predecessor to the Department of Homeland Security ("DHS"). I later became the Director of the International Student and Scholar Office of Tufts University, Health Sciences Campus in Boston, where I was responsible for managing all aspects of immigration benefits for certain nonimmigrant visa holders and Legal Permanent Resident cases.

3. I was a founding member of NewFront Software, a company that created fsaATLAS, one of the first software programs designed for institutional use to interface with the Student and Exchange Visitor Program ("SEVP"). SEVP, now housed within Immigration and Customs Enforcement ("ICE"), certifies schools that are authorized to enroll F-1 and M-1 students. The Student & Exchange Visitor Information System

("SEVIS") is a web-based system for maintaining information on nonimmigrant students and exchange visitors in the United States. In 2002, when INS developed the SEVIS system, our company worked directly with the agency to design a companion system that educational institutions could use to accurately exchange information with government databases governing nonimmigrant immigration records including the Department of State's student visa program and SEVP, among others. In 2003, fsaATLAS was acquired by Sungard-SCT (which merged into Ellucian), and the product was renamed "Ellucian ISSM."

4. Since obtaining my law license in December of 1999, I have specialized in immigration law, and specifically in academic immigration. I have been a member of NAFSA, the Association of International Educators (founded as the National Association of Foreign Student Advisors ("NAFSA") since 1993. NAFSA is a nonprofit association "dedicated to international education and exchange." This is the primary professional association for DSO international student advisors. I have also been a member of the American Immigration Lawyers Association ("AILA") since 2000. As a member of NAFSA and AILA, I have served in various national leadership roles and have provided guidance to members on academic immigration issues through practice advisories, speaking engagements, book chapter contributions, and answering direct questions on listservs.

5. My immigration law practice focuses on a variety of different visa and status types. These include academic, medical, business, and family immigration, with expertise in F-1 (student) and J-1 (exchange visitor) visa categories, their accompanying relatives also known as derivatives, and institutional sponsorship obligations—including detailed knowledge of the F-1 international student program, SEVIS, and the laws, regulations,

and legal guidance related to SEVIS and international students in F-1 status. I have represented both students and institutions in relation to SEVIS compliance, record termination requirements, and reinstatement applications.

**F-1 Student Visas and Status**

6. SEVIS is used to monitor and manage information pertaining to nonimmigrant students in F-1, J-1, or M-1 visa status and their dependents. Schools sponsoring F-1 students must be certified by SEVP, a component of Immigration and Customs Enforcement ("ICE")'s sub-agency, Homeland Security Investigations ("HSI"). As part of the SEVP certification process, schools must designate one employee as a Principal Designated School Official ("PDSO") and at least one additional employee as a Designated School Official ("DSO"). Only the PDSO and DSO (or multiple DSOs) are given access to the SEVIS database. These school officials are the primary point of contact for the F-1 students and are responsible for processing SEVIS record terminations when required by regulations.

7. To obtain a nonimmigrant visa to study at an accredited institution in the United States, a foreign national must obtain a student visa (in this case F-1 visa) through the Department of State ("DOS"). The first step for a student interested in obtaining a student visa is to apply to a SEVP-approved school in the U.S.A. Once accepted, the student's biographical and academic program must be entered into SEVIS by the DSO to secure a Form I-20 form the SEVP-approved school.

8. A DSO works with incoming international students to obtain the information and documentation needed to create an individual SEVIS record for each student. Each student record has a distinct SEVIS number. After record creation is

completed, the DSO will issue and sign an Initial Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," and forward that document to the student. With an Initial Form I-20 a student may apply for a student visa through the DOS; the student must also present this document at the consulate abroad when they appear for the visa interview. Once approved, the student will receive an immigration benefit called a "nonimmigrant visa" in their passport. This serves as authorization for admission to the U.S.A. that can be presented to a U.S. Customs and Border Protection ("CBP") official when seeking admission at a port of entry. Once inspected and admitted, the nonimmigrant visa holder enters into F-1 student status. Visas and status are two separate immigration benefits.

9. For students already in the U.S.A. under another nonimmigrant status, the DSO still would issue and sign the Form I-20, but rather than interface with the DOS and consulates abroad, the student would seek a Change of Status to F-1 by filing a Form I-539 Application to Change or Extend Status with United States Citizenship and Immigration Services ("USCIS"). If approved by USCIS, the agency grants the requested status and provides evidence in the form of an I-94 Record of Admission with the notation D/S (or "Duration of Status"). Importantly, when an F-1 student or any other nonimmigrant receives an approved change of status, they do not have a corresponding visa that permits re-entry to the United States if they travel abroad. To secure a visa stamp that allows one to enter the U.S.A. from abroad after receiving a Change of Status from USCIS, one would need to depart the U.S.A., apply and be interviewed at a consulate abroad, and receive the visa stamp from DOS. However, the nonimmigrant visa holder is not required to leave the U.S.A. to secure a new visa stamp from DOS. If they do not depart the U.S.A., they do not need a new stamp.

10. After entering the U.S.A., the F-1 student reports to the DSO, enrolls and begins attending school, and the DSO updates the SEVIS record to confirm that the student is duly enrolled in a full-time program of study. These processes highlight the multiple U.S. departmental and agency touchpoints – ICE, USCIS, CBP, and DOS – one is likely to encounter when seeking nonimmigrant student status in the United States.

11. To maintain status, F-1 students must follow specific requirements including, but not limited to: maintaining a full-time course load each semester (with an exemption given for the final semester if less than full-time credits are needed to graduate); refraining from any unauthorized employment and only participating in authorized employment, whether on- or off-campus; reporting to the DSO before taking any actions that may affect their SEVIS record such as dropping to part-time status, taking medical leave, withdrawing from the program, participating in academic internships, or updating employment information post-graduation on OPT/STEM OPT and address changes, as well as reporting to the DSO at the start of each session or semester or using whatever method the DSO requires to confirm enrollment each semester. Although it is not required by the regulations, DSO's best practice advice is to seek information from the student with regards to any change of status or adjustment to legal permanent resident. In my experience, institutions will request that information from their students to ensure accurate record keeping.

12. F-1 student status continues as long as the nonimmigrant continues to study in the United Sates because anticipated educational program end dates are subject to change and F-1 status includes periods of approved post-degree completion employment authorization following completion of their academic program. F-1 students are

authorized to work up to 20 hours a week on campus and full-time during school vacation periods. The student's I-94—the document which records the arrivals and departures of individuals visiting the United States—will have a "Duration of Status" or "D/S" annotation rather than a fixed end date.

13. Duration of Status ("D/S"), unlike status duration periods on other I-94 forms, is unique because the expiration is tied to maintaining one's status within the bounds of their I-20. Unlike individuals entering under other visas who receive a date certain when their authorized stay in a given status expires, individuals whose I-94 indicates admission until "D/S" are treated differently. When a student may have violated the terms of their status, they are not immediately out of status or unlawfully present in the U.S.A. Typically, if a DSO suspects or confirms that a violations occurred, the DSO investigates and potentially terminates the SEVIS record. Prior to reports of SEVP terminating SEVIS records in late March 2025, I know of no prior situation in which SEVP terminated a SEVIS record based on any interaction with law enforcement. Rather, in my experience, their practice has been to notify the DSO of the violation. It is up to the DSO to determine if termination is warranted. In fact, in the rare instance where HSI may ask a DSO to terminate, the DSO would not terminate if upon further review there was no violation.

14. Formal adjudications deeming F-1 students "out of status" or "unlawfully present" are made by (1) an immigration judge during removal proceedings; or (2) USCIS during adjudication of an immigration benefit application or petition. Nevertheless, a "failure to maintain status," which is evidenced by termination of a SEVIS record, is serious. Depending on a given Administration's immigration enforcement priorities, it can lead to the student being placed in removal proceedings, adjudicated out of status,

and deported. A "failure to maintain status" can also make it difficult or impossible for an individual to obtain a green card in the future. It can serve as a negative discretionary factor in the green card application, and if someone is in the U.S. without status for over 180 days and then leaves the country, they can be inadmissible (and ineligible for a green card) when they attempt to return.

15. The reasons to terminate a SEVIS record are clearly articulated in SEVIS guidance and regulations. Having a misdemeanor conviction, or merely a fingerprint/name "hit" in the FBI database, does not lawfully trigger SEVIS record termination. Additionally, having a visa revoked by DOS is also not, in and of itself, without any further review, a reason to terminate a student's SEVIS record. In my experience prior to 2025, I am aware of no time when ICE terminated a SEVIS record solely due to visa revocation, an FBI criminal check "hit," or even evidence of a misdemeanor conviction. This is because, by ICE and DOS' own guidance, these are not grounds to trigger SEVIS record termination.

**Recent SEVIS Terminations and their Ongoing Harm**

16. In late March 2025, it became clear that ICE practices changed. Between March 28, 2025, and April 11, 2205, I observed and learned of several hundred student visa revocations and have direct review of dozens of international students whose SEVIS records were terminated with a termination reason of "Otherwise failing to maintain status: Individual identified in criminal records check and/or has had the VISA revoked. SEVIS record has been terminated." ICE's forced record termination of a single student record based on either a criminal records check or a visa revocation would be very abnormal, but terminating several hundred as ICE has done is unprecedented. This is

also the first time I am aware of that a visa revocation has been specifically referenced as a basis of termination of the SEVIS record.

17.  I also observed that for several of these students, including some of plaintiff students in this action, the SEVIS record termination reason was changed from an initial notation reading "FAILURE TO MAINTAIN STATUS" to "other . . . ." The "failure to maintain status" description was inexplicably deleted from the record after a few days. The actions within SEVIS reflect a significant shift in behavior for ICE. With the first group of terminations, ICE acted in place of a DSO, using the termination dropdown menu available to DSOs, which included the option of the initial notation "FAILURE TO MAINTAIN STATUS." With this change, ICE appears to now be using the termination dropdown menu available only to SEVP staff. While this may seem inconsequential, it is not.

18.  Evidence of the termination options available to different parties is found at: https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/termination-reasons. The termination reasons available to ICE/SEVP are on the "SEVP-Only Termination Reasons" table. While the records' use of "SEVP Only Termination Reasons" confirms that ICE is unilaterally terminating student records–which, to my knowledge, it never did before–ICE has failed to provide any regulatory basis for these terminations. The reasons given are not within those permitted by SEVIS regulations and guidance.

19.  In late April 2025, I received information from students and institutions that I had consulted with that ICE had begun reactivating some of the previously terminated SEVIS records, including those of plaintiffs in this action. However, there are unresolved immigration status concerns that must be addressed because they pose

serious consequences for students. The SEVIS records that I have seen, including redacted versions of plaintiffs in this action, continue to include a gap in their maintenance of student status, in some cases nearly a month, caused by termination of their SEVIS record based on the results of a criminal record check or a visa revocation.

20. This record of termination and gap in status in the SEVIS system raises several serious concerns, not least of which is defamation. Any attorney that represents nonimmigrants knows that it is critical their records are as clean as possible. It is very likely that derogatory history like this will have imminent and/or long-term impacts on students' ability to remain in the country, maintain their F-1 student status, obtain OPT/STEM OPT, transfer to another nonimmigrant status, return to the United States after travel abroad, and adjust their status. It also forces students to decide whether to admit to a violation of status when seeking immigration benefits in the future. Without clear guidance, students would have no choice but to disclose any gaps or terminations on their SEVIS record to avoid risking their credibility. A failure to admit a violation could result in a declaration of perjury and an admission could lead to a denial of a benefit depending on whether the adjudicator determines the SEVIS termination was a violation of status.

21. In this case, Plaintiffs' SEVIS records indicate that plaintiffs were terminated for approximately a month based on criminal records checks or visa revocation. That derogatory information can be accessed by other governmental agencies and departments including DOS, CBP, and USCIS. There is every reason to believe that this information will cause various agencies to flag these Plaintiffs in future dealings, given the criminal and immigration violations identified as the basis for termination. Further, the derogatory SEVIS record history will likely trigger scrutiny by CBP, including

through secondary inspection when a student arrives at a port of entry for inspection and admission.

22.     The fact that the plaintiffs' statuses were returned to "Active" does not address the negative history that now appears in their SEVIS records. ICE's solution here does not even offer the same level of protection as Reinstatement of Student Status. In reinstatement cases, a student that has failed to maintain status, unlike the plaintiffs in this case, applies for and receives retroactive approval to remain in the US to continue to seek the benefits of their status with confirmation that the related violation will not cause future immigration problems.  The current termination and activation of records provides no comparable confirmation that the related violation will not cause future harm. At best, setting the records to "Active" without clarification creates confusion and uncertainty on key aspects of the students' status.  This reactivation of records with gaps in status is something less than an adjudicated benefit, such as reinstatement, that guarantees the student the ability to seek and obtain benefits now and into the future.

23.     The period that the Plaintiffs' SEVIS records were terminated, causing them to become unemployed, also causes them ongoing harm.  For students graduating this year who must apply for OPT, the regulations require one full year of academic attendance to qualify for filing. DHS has not issued any guidance instructing USCIS to waive the gap in these records for the purpose of OPT eligibility. These students have also been harmed because they were unemployed during the period their SEVIS records were terminated. This is important because students cannot have more than 90 days of unemployment under OPT and no more than 150 days of unemployment throughout the OPT and STEM OPT periods, or else they will be ineligible.

24. The harms listed above also affect all family members of the affected F-1 students--who are legally present in the United States as "derivatives" under F-2--because their SEVIS records were also terminated. The negative consequences of termination of a SEVIS record, due to a violation of status, therefore, also flow down to the spouse and children of the F-1 student. Thus, a significant number of people are negatively impacted by these concrete harms, and these harms are still unresolved despite the recent spate of SEVIS reactivations.

I am not a party to this action or proceeding. I am aware of the facts stated herein of my own knowledge, and, if called to testify, I could and would competently so testify.

Executed on May 5, 2025, in Boston, MA.

*[signature]*

Elizabeth A. Goss, Esq.