**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Student DOE #1, Student DOE #2, Student DOE #3, Student DOE #4, Student DOE #5, and Student DOE #6,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security, Todd LYONS, Acting Director, U.S. Immigration and Customs Enforcement, Ricky J. PATEL, in his official capacity as Newark Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcement, and John TSOUKARIS, in his official capacity as Newark Field Officer Director, Enforcement and Removal Operation, U.S. Immigration and Customs Enforcement,<br><br>    *Defendants*. | Civ. No. 25-cv-2998 (KSH) (AME)<br><br><br><br>**PRELIMINARY INJUNCTION ORDER** |

**Katharine S. Hayden, U.S.D.J.**

## I.    Introduction

Plaintiffs, named as Student Does #1 through #6 ("Plaintiffs"), are five Rutgers University students and one recent graduate. All are citizens of China or India and up to the events challenged in this action, they maintained F-1 student status allowing them to study in the United States and had active records in the Student Exchange and Visitor Information System ("SEVIS").[1] On April 22, 2025, they filed a four-count complaint against the above-named

---

[1] SEVIS is a "web-based system for maintaining information on nonimmigrant students and exchange visitors in the United States," and "is used to monitor and manage information pertaining to nonimmigrant students in F-1, J-1, or M-1 visa status and their dependents." (D.E. 29, Declaration of Elizabeth Goss, Esq. ("Goss Decl.") ¶¶ 3, 6.) "F-1 student status" is a nonimmigrant classification that requires compliance with certain regulatory requirements. *See* 8 C.F.R. §§ 214.1, 214.2. It is separate from the F-1 visa that authorizes admission to the United

Defendants ("Defendants") asserting, in pertinent part, that Defendants had terminated their SEVIS records and their F-1 student status as a consequence, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Due Process Clause of the Fifth Amendment to the United States Constitution.  (D.E. 1, Compl.)

The same day, Plaintiffs moved for a temporary restraining order that would direct Defendants to (1) restore and set aside the termination of their SEVIS records and status, and (2) enjoin Defendants from enforcing, implementing, or otherwise imposing legal consequences as a result of their decision to terminate Plaintiffs' SEVIS records or F-1 status, including arresting, detaining, or removing Plaintiffs from this Court's jurisdiction without at least 30 days' notice to Plaintiffs, their counsel, and the Court.

Plaintiffs supported their filing with a brief (D.E. 2-1, Br. for TRO), declaration of counsel with exhibits, declarations from Plaintiffs themselves, and a declaration of the vice president for Global Affairs at Rutgers University, who supplied background about how Rutgers uses and accesses SEVIS records and explained the series of changes to Plaintiffs' SEVIS records that preceded this lawsuit.  (D.E. 2 to 2-4; D.E. 3 to 3-5.)  Plaintiffs argued for interim restraints based on their likelihood of success on the merits of their claims in counts 1 and 2 of their complaint, asserting that Defendants' actions violated the APA and the Due Process Clause and had caused and would continue to cause them irreparable harm absent relief, and that injunctive relief was warranted based both on the balance of equities and the public interest.

The following day, April 23, 2025, the Court issued an order setting a briefing schedule on Plaintiffs' motion and, to preserve its jurisdiction, enjoining Defendants from "transferring

---

States upon arrival at a port of entry.  (D.E. 29, Goss Decl. ¶ 8.)  And further, the Student and Exchange Visitor Program ("SEVP") "administers the F-1 student program and tracks information on students in F-1 student status through SEVIS."  (D.E. 1, Compl. ¶ 36.)

Plaintiffs out of this Court's jurisdiction, or taking them into custody, or arresting or detaining them" pending further Court order. (D.E. 10.) On April 24, Defendants filed their opposition arguing that none of the four factors for injunctive relief had been shown.

Amid the briefing, on Friday, April 25, Plaintiffs filed a letter (D.E. 14) advising the Court of two developments: first, three of the six Plaintiffs had their SEVIS records reactivated, albeit without explanation and with the prior termination still appearing in the record. Second, the letter cited reporting elsewhere that Immigration and Customs Enforcement ("ICE") "is developing a policy that will provide a framework for SEVIS record terminations" and that ICE would reactivate certain Plaintiffs' records "[u]ntil such a policy is issued." (*Id.*) Plaintiffs took the position that their case remained live and that relief was still necessary; accordingly, they filed their reply a short time later.

The Court then scheduled a status/scheduling conference for April 28, which was continued on April 29, when the parties could not reach agreement on the scope of preliminary restraints. On April 28, counsel advised the Court that all six Plaintiffs' SEVIS records had been restored by that point. Plaintiffs maintained, however, that notations remained in those records that continued to inflict harm on them. Both sides acknowledged that an updated policy they anticipated Defendants would be developing with respect to SEVIS terminations may change the lawsuit in ways that the parties would need to account for in their submissions.

By the time of the April 29 continued conference, Plaintiffs had submitted a proposed order that would modify the parameters of the injunctive relief they were seeking. Defendants did not consent to any relief being granted. Plaintiffs' proposal, which was docketed at D.E. 23, sought an order: (1) continuing the restraints previously entered, namely that "pending further order of the Court, Defendants are enjoined from transferring Plaintiffs out of this Court's

jurisdiction, or taking them into custody, or arresting or detaining them"; (2) requiring Defendants to immediately (within 72 hours), restore Plaintiffs' SEVIS records "to the *status quo ante* striking all text within SEVIS that refers that refers to the erroneous termination of Plaintiffs' records"; (3) enjoining Defendants, pending further order of the Court, from "directly or indirectly enforc[ing], implement[ing], or otherwise impos[ing] any consequences arising out of any decision by Defendants to terminate Plaintiffs' SEVIS records or F-1 status, without at least 30 days' written notice to the Court and to the Plaintiffs and their counsel"; (4) specifying that "Defendants shall retain the authority to terminate SEVIS records for other lawful reasons, such as if Plaintiffs fail to maintain their nonimmigrant status after their record is reactivated or engages in such unlawful activity as would render them removable from the United States under the Immigration and Naturalization Act, provided however, that pending further order of the Court, Defendants shall not terminate Plaintiffs' SEVIS records, F-1 status, or F-1 visas, without providing at least 30 days' notice to the Plaintiffs and their counsel so that they may make any appropriate application to the Court"; (5) granting Plaintiffs leave to amend their complaint within 14 days of receiving notice "If and when Defendants develop a 'policy for SEVIS termination'"; and (6) specifying a briefing schedule.

After hearing the parties' positions, and to continue to preserve its ability to hear this case on the merits while the parties considered their next steps amid a changing factual landscape, the Court temporarily granted Plaintiffs' proposed relief with the exception of the paragraph that would direct Defendants to strike text from Plaintiffs' SEVIS records. (D.E. 25.) The Court also set down a hearing on Plaintiffs' motion for May 7, and directed the parties' supplemental briefs to be filed by May 5, 2025, at 9:00 a.m., which was done.

4

Plaintiffs' papers included their supplemental brief (D.E. 28), supplemental declarations from each plaintiff (D.E. 30 through D.E. 30-5), a declaration from Elizabeth Goss, Esq., an immigration attorney whose career also included time as a university Designated School Official/Responsible Officer and as a member of a software company that developed a program to interface with the SEVP (D.E. 29), and a second declaration of counsel with exhibits (D.E. 31).

The Goss Declaration explained that schools certified by the government to enroll international students are required to designate school officials to manage and update records for students in nonimmigrant status, and that only the Principal Designated School Official ("PDSO") and any Designated School Officials ("DSOs") are given access to the SEVIS database. (D.E. 29, Goss Decl. ¶¶ 2, 6.) The declaration further described the multiple steps a student must take before and upon arriving in the United States as an F-1 nonimmigrant student, which process involves "multiple U.S. departmental and agency touchpoints – ICE, USCIS, CBP, and DOS – [that] one is likely to encounter when seeking nonimmigrant student status in the United States." (*Id.* ¶ 10.) Goss provided background on the requirements for F-1 status; the typical sequence of events when a question about maintenance of status arises and consequences of failing to maintain status; and how the recent developments involving Plaintiffs' SEVIS record terminations followed an unprecedented and atypical course. (*See generally id.*)

In their brief, Plaintiffs argued that the factors for injunctive relief remained satisfied, and that the SEVIS record updates to that point had not returned them to the position they held prior to Defendants' assertedly unlawful actions. The interim relief sought was the continuation of the terms of the April 29 order plus an additional term requiring Defendants to, within 72 hours, restore Plaintiffs' SEVIS records to how they appeared before the termination, that is, striking all

text and data within SEVIS and in systems populated with data from it that refer to the prior termination of Plaintiffs' SEVIS records or F-1 status.

Defendants' supplemental brief (D.E. 27) argues that the Court should "dissolve the existing TRO" and "decline to impose any further injunctive relief, including a preliminary injunction" and "permit this case to proceed to the processes set forth in [Fed. R. Civ. P. 12]." Defendants take the position that Plaintiffs had already obtained relief "without a judicial order because ICE reactivated [their] SEVIS accounts" and that the remaining issues – including the current contents of Plaintiffs' SEVIS records and the effect of the period between termination and reactivation – could proceed on a non-emergent, ordinary-course litigation timetable. (*Id.* at 1.) Defendants continue to argue that Plaintiffs' claimed harms are speculative, not irreparable, and in some instances not cognizable as part of a request for injunctive relief; that neither of the claims on which Plaintiffs base their injunction request are likely to succeed; as to the APA claim specifically, they assert that it is barred by sovereign immunity; and that the balance of equities and public interests favor denying relief.

Later, Defendants filed a "Notice" "apprising the Court of a development that may impact the claims in this suit," namely that "As of April 26, 2025, [ICE] has promulgated a new policy concerning the termination of records in [SEVIS]," and attaching a copy of the "new policy." (D.E. 32.)

On May 6, 2025, the day before the hearing, Defendants filed another notice (D.E. 35) about a "development that may impact the claims in this suit," attaching a declaration from James Hicks, the Division Chief of External Operations at SEVP within Homeland Security Investigations ("HSI") at ICE. After setting forth his credentials, Hicks stated the following:

> 3. For each plaintiff(s) in this case, SEVP has set their SEVIS record back to "active." When the record was set to "active," all previous information that was

6

part of the SEVIS record is restored, and there are no "gaps" or "lapses" in the SEVIS record. However, due to technical limitations of the SEVIS system, the event history for a given record cannot be deleted from the system.

4. When specifically annotated on a court's order, SEVP adds a notation into SEVIS record, indicating that the record has been restored retroactively to the original date of the termination. Because of the technical limitations of the SEVIS system, these notations are not viewable by end-users outside of SEVP, such as Designated School Officials. Nonetheless, these notations are still part of the official SEVIS record.

(D.E. 35, Declaration of James Hicks ("Hicks Decl.") ¶¶ 3-4.)

At the May 7, 2025 hearing, Defendants offered the declaration of Andre Watson, who describes himself as the Senior Official within and Assistant Director of the National Security Division for HSI. Pertinent to the issues before this Court, Watson stated:

4. Beginning in March of 2025, ICE reviewed and terminated numerous SEVIS records due to information provided by U.S. Department of State and criminal databases.

5. ICE has re-activated SEVIS records for plaintiff(s) who met the parameters above.

6. ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the NCIC record that led to its initial termination.

7. ICE's reactivation of the plaintiff(s) SEVIS record is being made retroactive to the date of its initial termination such that there is no gap in the plaintiff(s)' SEVIS record.

8. For plaintiff(s) who were or are currently engaged in Optional Practical Training (OPT) where SEVP also edited the SEVIS record to change the OPT employment authorization end date, the record had been reset to the end date set forth in the alien's SEVIS record before its termination.

(D.E. 38, at 3-4, Declaration of Andre Watson ("Watson Decl.") ¶¶ 4-8.) Defendants argued that this additional declaration further supported their position that no injunctive relief is warranted because Plaintiffs had, by virtue of Defendants' voluntary actions subsequent to the terminations, gotten the relief they needed, and that the remainder of the case could proceed on an ordinary

schedule.  Plaintiffs countered that the harm caused by Defendants' prior actions was continuing notwithstanding these developments, and the need for a preliminary injunction remained live.

Today, Defendants filed a declaration of Michelle Young, who is employed by U.S. Citizenship and Immigration Services ("USCIS") as an Associate Portfolio Director with the Service Center Operations Student, Appeals, Family & Employment Portfolio.  (D.E. 38, at 6-7, Declaration of Michelle Young ("Young Decl.") ¶ 2.)  Young described her responsibilities as "overseeing the processing and adjudication of immigration benefit applications, petitions, and requests related to nonimmigrant students, families, appeals and employment authorization." (*Id.*)

Young's declaration is not specific to Plaintiffs' circumstances; instead, it speaks to what Young's agency, USCIS, generally does in certain scenarios.  Relevant here, Young states that USCIS "conducts security checks on individuals applying for immigration benefits" which can include a request to change "to a different nonimmigrant status, a request for Optional Practical Training ("OPT"), or reinstatement after a failure to maintain F-1 nonimmigrant status," and that those security checks include review of SEVIS records.  (*Id.* ¶ 5.)  If in the process of adjudicating an immigration benefit request,

> USCIS finds that an F-1 nonimmigrant's SEVIS record was terminated and then reactivated by ICE, USCIS would continue processing the benefit request according to all applicable laws, regulations, policies, and procedures. The SEVIS record termination and reactivation would not, *per se*, have a negative impact on the benefit request's adjudication.

(*Id.* ¶ 11.)  Young's declaration also suggests that an F-1 student only "begin[s] to accrue unlawful presence" after adjudication and findings by USCIS or an immigration judge that the student failed to maintain status.  (*Id.* ¶¶ 9-10.)

## II.    Factual Background

As noted earlier, Plaintiffs are citizens of China or India currently in the United States on F-1 student visas.  Five are currently pursuing master's or PhD degrees at Rutgers University ("Rutgers").  (D.E. 2-1, Br. for TRO, at 1, 13; *see* D.E. 3-1 ("Doe #2 Decl.") ¶¶ 5-6; D.E. 3-2 ("Doe #3 Decl.") ¶¶ 4-7; D.E. 3-3 ("Doe #4 Decl.") ¶¶ 4-6; D.E. 3-4 ("Doe #5 Decl.") ¶¶ 4-5; D.E. 3-5 ("Doe #6 Decl.") ¶¶ 1, 7, 9-10.)  Student Doe #1 recently graduated from Rutgers but was working through post-completion OPT as a software developer and business analyst.  (Br. for TRO, at 13; D.E. 3 ("Doe #1 Decl.") ¶¶ 1, 8-9.)

In early April 2025, Plaintiffs received emails from Rutgers informing them that their SEVIS records were terminated or that their F-1 visas were revoked.  (Br. for TRO, at 13-14.)  On April 3 and 5, Student Does #1, #2, #3, and #6 were told by Rutgers that their records were terminated for "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked.  SEVIS record has been terminated." (*Id.*; Doe #1 Decl. ¶ 12; Doe #2 Decl. ¶ 9; Doe #3 Decl. ¶ 10; Doe #6 Decl. ¶¶ 14-15.)

Student Does #4 and #5 were notified on April 8 by Rutgers that their SEVIS records were terminated for "OTHER – Individual identified in criminal records check and/or has had their VISA revoked.  SEVIS record has been terminated."  (Doe #4 Decl. ¶¶ 9-10; Doe #5 Decl. ¶ 8.)  Only Student Doe #1 was provided further information from ICE regarding their record termination, notifying them that their "OPT authorization period had ended," and that their SEVP portal account "will close on October 5, 2025, with the account becoming read-only on April 19, 2025."  (Br. for TRO, at 14; Doe #1 Decl. ¶ 2.)

Copies of Plaintiffs' SEVIS records are attached to their supplemental submission.  (D.E. 31, Second Declaration of Molly K.C. Linhorst ("Second Lindhorst Decl."), ¶ 2(A) & Ex. A.)  These exhibits anchor Plaintiffs' explanations about how the terminations appear in those

records.  Taking the second record as an illustration, each line reflects a different change to one or more fields.  Certain lines are expandable, and when expanded show additional information. Under the "Terminate – User Termination" entry dated April 4, 2025, the expanded fields include "Field Changed," "Old Value," and "New Value."  The "New Value" contains the language Plaintiffs contest.  An excerpt of this SEVIS record is below:

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| Manual Data Change | 04/24/2025 17:19:27 | ACTIVE | SEVIS Maintenance |
| Manual Data Change | 04/08/2025 00:06:08 | TERMINATED | SEVIS Maintenance |
| Manual Data Change | 04/04/2025 09:29:00 | TERMINATED | SEVIS Maintenance |
| Terminate - User Termination | 04/04/2025 09:29:00 | TERMINATED | SEVIS Maintenance |

| Field Changed | Old Value | New Value |
|---|---|---|
| Termination Reason | | OTHERWISE FAILING TO MAINTAIN STATUS |
| Explanation | | Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated. |

(D.E. 31, Second Lindhorst Decl., Ex. A, at page 12 of 200.)[2]  All six records include the same language in the "Explanation" field.  The first record contains additional text in a "Remarks" field; that text is replaced with the data populated in the "New Value" fields:

---

[2] This pagination refers to the numbers assigned by the CM/ECF system.

| | Terminate - User Termination | 04/04/2025 17:31:11 | TERMINATED | SEVIS Maintenance |
|---|---|---|---|---|

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|

| Field Changed | Old Value | New Value |
|---|---|---|
| Termination Reason | | OTHERWISE FAILING TO MAINTAIN STATUS |
| Explanation | | Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated. |
| Remarks | Student will complete all degree requirements and is thus eligible for post completion OPT. Student intends to engage in practical training that is directly related to their field of study and commensurate with the level of study. | |

(D.E. 31, Second Lindhorst Decl., Ex. A, at pages 6-7 of 200.)

Because Plaintiffs have not received notice that their F-1 student visas have been revoked,[3] they deduced that their SEVIS record terminations were initiated based on a criminal records check, which the record developed on this motion has borne out. Plaintiffs summarize the events that brought them to the attention of the criminal justice system as follows:

- Student Doe #1 pled guilty in September 2024 to a municipal ordinance violation. (Doe #1 Decl. ¶ 10.)

- Student Doe #2 received a court summons in 2022 for an issue with their car insurance. (Doe #2 Decl. ¶ 7.) The student entered the pre-trial intervention program, leading to the charge being dismissed and the case being expunged. (*Id.*)

---

[3] Plaintiffs have consistently drawn a line between F-1 student status and their SEVIS records, the termination of which is the subject of their complaint and request for injunctive relief, and their F-1 visas, which are not.

11

- Student Doe #3 received a violation in 2015 for Elizabeth City Ordinance 9.20.020, which prohibits loitering, a non-criminal violation.  (Doe #3 Decl. ¶ 9.)  The student also admitted to some parking and driving violations.  (*Id.*)

- Student Doe #4 was "falsely charged" in 2020 with simple assault.  (Doe #4 Decl. ¶ 8.)  The student maintains that the charge was dismissed, the case was expunged, and that they have no criminal convictions.  (*Id.*)

- Student Doe #5 received a violation of N.J.S.A. 39:3-29a for failure to possess a driver's license that they are currently resolving before the municipal court.  (Doe #5 Decl. ¶ 7.)  The student also admits to "a dismissed and expunged criminal matter," but that they have "no criminal convictions."  (*Id.*)

- Student Doe #6 received parking and driving violations in the United States, "as well as a dismissed case."  (Doe #6 Decl. ¶ 8.)  The student maintains they have no criminal convictions.  (*Id.*)

After Student Doe #1's SEVIS status was terminated, their employer fired them.  (Doe #1 Decl. ¶ 17.)  The other Plaintiffs were not able to continue research for their degrees because of the SEVIS record termination.  (Br. for TRO, at 15.)  Further, Student Doe #4's research assistant position was terminated, along with their annual stipend of $40,000, due to their SEVIS record termination.  (Doe #4 Decl. ¶ 13.)

Plaintiffs submit that their "education and career trajectories, financial well-being, and mental health" have been threatened as a result.  (Br. for TRO, at 15.)  They cite present and ongoing severe impacts on their mental health.  (*Id.*)  They express concern that they will run out of money due to their sudden loss of employment (Doe #1 Decl. ¶ 17; Doe #4 Decl. ¶ 13); that they will lose progress on, or be unable to complete, their master's and PhD degrees (Doe #2 Decl. ¶ 14; Doe #3 Decl. ¶¶ 11-15; Doe #4 Decl. ¶ 13; Doe #5 Decl. ¶ 10; Doe #6 Decl. ¶ 18); and that their changed status will result in deportation (Doe #2 Decl. ¶ 15; Doe #4 Decl. ¶ 15; Doe #5 Decl. ¶ 11).  Highlighting recent news stories about ICE "picking up students on the street and deporting them," Plaintiffs express that they are afraid to go outside "out of fear that [they] will be detained."  (Doe #4 Decl. ¶ 15; Doe #6 Decl. ¶ 19.)

Plaintiffs maintain that the negative consequences they described in their initial submissions continue to impact them even after the reactivation of their SEVIS records because those records still contain notations about termination and criminal records.  They cite ongoing harm to their reputations, academic and career prospects, and earning potential; constraints on their freedom to travel abroad to visit their families and increased risk they will be unable to reenter the United States after any international travel; a heightened risk of re-termination of SEVIS records and F-1 status, and of being targeted for detention and removal; a risk of future immigration harm due to the gap in their SEVIS records, including not being able to change to another immigration status; interference with their ability to participate in OPT or to extend their OPT work period; ongoing violations of their due process rights; and ongoing stress and anxiety arising from the notations in their SEVIS records.  (D.E. 28, Pl. Supp. Br., at 6-12; D.E. 30 to D.E. 30-5, Second Declarations of Does #1, 2, 3, 4, 5, and 6.)

### III.    Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of TROs and preliminary injunctions.  A preliminary injunction may only be issued on notice to the adverse party, while TROs may be issued without notice, so long as other procedural safeguards are followed.  Fed. R. Civ. P. 65(a)(1), (b).  Substantively, the legal standards are the same, and as the parties agreed on the record at the May 7 hearing, this case is now in a procedural posture where the question of a preliminary injunction, rather than a TRO, is before the Court.  To be granted that relief, Plaintiffs must demonstrate:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured . . . if relief is not granted. . . .  [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

13

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974) (citations omitted)); *see also Durel B. v. Decker*, 455 F. Supp. 3d 99, 106 (D.N.J. 2020) (McNulty, J.) (as to temporary restraining order).

The first two factors are considered the "gateway factors" and are the "most critical" to the analysis. *Reilly*, 858 F.3d at 179. A likelihood of success on the merits "means only a 'reasonable probability' of success—odds that are 'significantly better than negligible but not necessarily more likely than not.'" *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025) (quoting *Reilly*, 858 F.3d at 179). And the standard for irreparable harm requires a showing of more likely than not. *Id.* (citing *Reilly*, 858 F.3d at 179). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179. Where, as here, the government is the opposing party, the last two factors merge for purposes of the Court's analysis. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Informing these factors is the general understanding that interim injunctive relief is an "extraordinary remedy" that serves a specific, narrow purpose; it is warranted only to "preserve the relative positions of the parties until a trial on the merits can be held." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024). To be afforded this relief, it must be the case that "the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury." *Id.* (citations omitted).

## IV.    Discussion

### A.  Whether Plaintiffs are Likely to Succeed on the Merits of their Claims

To grant the requested relief, the Court must be able to conclude that Plaintiffs are likely to succeed on at least one of their claims. *Pa. Pro. Liab. Joint Underwriting Ass'n v. Wolf*, 328 F. Supp. 3d 400, 410 n.2 (M.D. Pa. 2018). For the reasons below, the Court concludes that Plaintiffs are likely to succeed on their claim that Defendants' terminations of their SEVIS records violated the APA.

### 1.  *What the APA Requires of Federal Agencies*

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal quotation marks and citation omitted). "It requires agencies to engage in reasoned decisionmaking and directs that agency actions be set aside if they are arbitrary or capricious." *Id.* (cleaned up).

Under 5 U.S.C. § 706, a court reviewing an agency action "shall . . . hold unlawful and set aside [any] agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D). Whether an action was arbitrary and capricious or an abuse of discretion looks to "the decisionmaker's process in arriving at a particular outcome, asking whether [the decisionmaker] considered the appropriate factors and properly justified [the] decision." *Wilkinson v. Attorney General*, 131 F.4th 134, 140 (3d Cir.

2025).[4]  Agencies are also bound by their own regulations.  *Leslie v. Attorney General of U.S.*, 611 F.3d 171, 175-76 (3d Cir. 2010) (citing *Accardi v. Shaughnessy*, 347 U.S. 260 (1954)); *De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400, 409 (D.N.J. 2018) (Arleo, J.) ("A government agency is not free to disregard its own regulations.").

### 2.  *How SEVIS Status Permissibly May Be Terminated*

SEVIS termination may occur in two scenarios:  (1) a student fails to maintain status or (2) the Department of Homeland Security ("DHS") terminates status.  *See* 8 C.F.R. §§ 214.2(f), 214.1(d); *see also Patel v. Bondi*, No. 25-101, 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025); *Isserdasani v. Noem*, No. 25-283, 2025 WL 1118626, at *1 (W.D. Wis. Apr. 15, 2025).

As to the first category, a student fails to maintain status when they fall out of compliance with F-1 status requirements by, for example, not maintaining a full course of study.  *See* 8 C.F.R. § 214.2(f) (listing requirements for F-1 status).  Students are also prohibited from engaging in particular conduct, including accepting unauthorized employment, providing false information to DHS, or engaging in criminal activity.  *See id.* § 214.1(e)-(g).

Criminal activity is defined to include instances where a student is "convict[ed] . . . for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed)."  *Id.* § 214.1(g).  Courts have found that a "conviction" for a crime of violence is necessary to constitute "criminal activity" under the regulations, as opposed to a "charge" for a crime of violence.  *See Isserdasani*, 2025 WL 1118626, at *4 (holding that, even if plaintiff's misdemeanor offense qualified as a crime of

---

[4] Only "final agency actions are reviewable under the APA," 5 U.S.C. § 704, and the Third Circuit has held that the termination of F-1 student status is a final agency action that this Court has jurisdiction to review.  *Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 182 (3d Cir. 2019).  Although Defendants have expressed their disagreement with *Jie Fang* in the briefing, they have done so only to "preserve the issue."  (D.E. 27, Gov't Supp. Br., at 20 n.3.)

violence, the charge was not ultimately pursued and plaintiff was never convicted); *Student Doe #1 v. Trump*, No. 2:25-cv-2825, D.E. 13 (D.N.J. Apr. 18, 2025) (Arleo, J.) (finding plaintiff's charge of simple assault did not constitute a conviction for purposes of the regulations).

As to the second category, termination of SEVIS status can occur (1) "by revoking a waiver that the Attorney General had previously authorized under [Immigration and Nationality Act] § 212(d)(3) or (4)," (2) "by the introduction of a private bill to confer permanent resident status," or (3) "pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons." *See Jie Fang*, 935 F.3d at 176 (quoting 8 C.F.R. § 214.1(d)).

### 3. *What Defendants Did Here*

There is no dispute over the central series of events here, laid out in greater detail *supra* and summarized again now: Plaintiffs were in-status as F-1 students, with active SEVIS records. Over several days in early April, each Plaintiff was informed that their SEVIS record had been terminated. As explained above, four Plaintiffs were told by their school that their records were terminated for "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked." The other two were told by their school that their records were terminated for "OTHER – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Only one Plaintiff got more information, this time from ICE: that their "OPT authorization period had ended," that their SEVP portal account "will close on October 5, 2025, with the account becoming read-only on April 19, 2025."

After this lawsuit was filed, and amid the briefing on Plaintiffs' TRO motion, Defendants notified Plaintiffs that their SEVIS records had been restored or reactivated. The reasons were

not supplied.  Also, the prospect of a revised or different policy for Defendants' approach to SEVIS record terminations was raised, and later, Defendants' May 5 "Notice" attached a "Broadcast Message" dated Saturday, April 26, 2025 asserting that the Department of State may revoke visas, which may result in immediate termination of a SEVIS record based on visa revocation and the initiation of removal proceedings.  (D.E. 32.)

Then, the day before the scheduled hearing in this matter, Defendants filed the Hicks Declaration confirming that Plaintiffs' records had been "set . . . back to 'active,'" restoring "all previous information" and leaving "no 'gaps' or 'lapses' in the SEVIS record."  (D.E. 35, Hicks Decl. ¶ 3.)  Hicks further declared that although "technical limitations of the SEVIS system" made notations not viewable by end-users, "[w]hen specifically annotated on a court's order, SEVP adds a notation into the SEVIS record" about retroactive restoration.  (*Id.* ¶ 4.)

Rather than informing Plaintiffs of why their records were suddenly terminated, Plaintiffs had only the notations in the SEVIS records, as communicated to Plaintiffs through Rutgers DSOs: a supposed failure to maintain status based on a visa revocation and/or a criminal records check.  Plaintiffs' visas were not revoked, so the remaining ground would be the criminal records check – but the so-called "criminal records" of Plaintiffs involved incidents that did not meet the requirements for termination of status under 8 C.F.R. §§ 214.2(f) and 214.1(d).  Defendants do not contend otherwise.  Indeed, the Watson Declaration admits (as explained below) that a criminal records check was the basis for the agencies' action.  Nor is there any argument or evidence that Plaintiffs' circumstances met any of the *other* bases for termination set forth in the regulations that bind then and Defendants.

Plaintiffs' supplemental brief cites testimony from ICE's Assistant Director Andre Watson in an April 29 hearing in the District Court for the District of Columbia.  There, Watson

explained that thousands of SEVIS record terminations were the result of an extremely fast-paced "student criminal alien initiative" that involved DHS leadership directing employees to run all 1.3 million noncitizen students in this country through the National Crime Information Center ("NCIC") database in a process that ultimately resulted in thousands of revoked visas and SEVIS record terminations without any individualized review.  (D.E. 28, Pl. Supp. Br., at 21-23; D.E. 31, Second Lindhorst Decl., Ex. B, Tr. of Oral Argument, *Patel v. Lyons*, 1:25-cv-1096 (D.C.C. Apr. 29, 2025).)

Plaintiffs have implied that this process was what resulted in their SEVIS record terminations, and Defendants confirmed that by way of the Watson Declaration offered on May 7.[5]  Watson describes ICE's termination of "numerous" SEVIS records beginning in March 2025 "due to information provided by U.S. Department of State and criminal databases" and the subsequent reactivation of those SEVIS records, and states that "ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the *NCIC record that led to its initial termination*."  (D.E. 38, at 3-4, Watson Decl. ¶¶ 4-6 (emphasis added).)

The end result is that Plaintiffs are likely to succeed on their claim that by relying on factors other than the ones allowed by regulation to terminate Plaintiffs' SEVIS records and, consequently, their F-1 status, Defendants have acted contrary to the APA, 5 U.S.C. § 706(2)(A), (C), (D), *Wilkinson*, 131 F.4th at 140 (arbitrariness of agency decision determined by whether decisionmaker "considered the appropriate factors and properly justified [the] decision"); and *Accardi*, *see Leslie*, 611 F.3d at 175-76.

---

[5] Watson was the witness who testified at the April 29 District of Columbia hearing.

### 4. *Why Defendants' Privacy Act Argument Does Not Compel a Different Result*

Defendants do not argue the merits of Plaintiffs' APA claim. They contend Plaintiffs cannot invoke the APA at all. The argument goes thus: Plaintiffs are seeking to alter the contents of their SEVIS records as they now appear after Defendants' reactivation or restoration of Plaintiffs' SEVIS accounts. So the APA claim is barred, based on sovereign immunity, because the appropriate statute for relief is the Privacy Act of 1974, and the APA's immunity waiver does not extend to cover claims "expressly or impliedly forbid[den]" by "any other statute." 5 U.S.C. § 702.

Defendants' initial premise is incorrect because, as Plaintiffs point out, "this case is about far more than amending records in a government database." (D.E. 15, Pls.' Reply Br., at 5.) Plaintiffs have sought a restoration of the F-1 student status that is connected with the SEVIS record and they challenge the agency action that deprived them of that status in a way that they contend was (and, as discussed above, likely was) arbitrary. They cite their injuries that have flowed and continue to flow from this agency decision, which, to be sure, include consequences from the residual notations that still appear in their SEVIS records. (*See* "Old Value" and "New Value" fields in the SEVIS records, as excerpted *supra*.) But even as to those residual notations, Plaintiffs' argument is not simply that the notations must be changed for the sake of an accurate record standing alone, but that they must be changed because they reflect continued limitations on Plaintiffs' *ex ante* status as F-1 students properly maintaining status. (*See* May 7, 2025 Tr. at 31:8-12 ("[T]his is not about correcting administrative factual error. This is about substantially challenging an agency's determination that the students have failed to maintain their status.").)

Properly framed under the record facts, Plaintiffs' APA claim is not barred by the interplay of the immunity waiver exception in § 702 and the Privacy Act. *See Parra Rodriguez*

*v. Noem*, No. 3:25-cv-615, 2025 WL 1284722, at *6 (D. Conn. May 1, 2025) ("[Plaintiff's]

requested relief is a substantive challenge to Defendants' decision to terminate her record rather

than merely correcting the accuracy of that record.").  The Privacy Act was enacted "to protect

the privacy of individuals identified in federal information systems," and "addresses the

government's retention and disclosure of personal information" while allowing "individuals to

seek a court order requiring it to correct its records." *Jane Doe 1 v. Bondi*, No. 1:25-cv-01998,

D.E. 43, at *20-21 (N.D. Ga. May 2, 2025) (quoting *Dep't of Ag. Rural Dev. Rural Hous. Serv.*

*v. Kirtz*, 601 U.S. 42, 63 (2024)).  It is "not 'a vehicle for amending the judgments of federal

officials as those judgments are reflected in records maintained by federal agencies.'" *Liu v.*

*Noem*, No. 25-cv-133, 2025 WL 1233892, at *8 (D.N.H. Apr. 29, 2025) (quoting *Barnett v.*

*United States*, 195 F. Supp. 3d. 4, 7 (D.D.C. 2016)).  Such relief—that substantively challenges

agency decisions—is properly sought under the APA.  *Parra Rodriguez*, 2025 WL 1284722, at

*6 ("The right response to error is to correct the disposition under the [APA]." (quoting *Douglas*

*v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994))).

     In recent weeks, Defendants' argument has been unsuccessful in a number of similar

cases.  *See Alliance for Retired Americans v. Bessent*, __ F. Supp. 3d __, 2025 WL 740401, at

*19 (D.D.C. Mar. 7, 2025).  *See, e.g.*, *Parra Rodriguez*, 2025 WL 1284722, at *6; *Arizona*

*Student Doe #1 v. Trump*, No. 25-cv-174, 2025 WL 1192826, at *6 (D. Ariz. Apr. 24, 2025); *SD*

*Student Doe #1, Plaintiff v. Noem, et al.*, No. 25-cv-926, 2025 WL 1194080, at *5 (S.D. Cal.

Apr. 24, 2025); *Madan B.K. et al., v. Noem*, No. 1:25-cv-419, 2025 WL 1171572, at *5 (W.D.

Mich. Apr. 23, 2025); *Chen v. Noem*, No. 1:25-cv-00733, 2025 WL 1163653, at *4-5 (S.D. Ind.

Apr. 21, 2025); *Jane Doe 1 v. Bondi*, No. 1:25-cv-01998, 2025 WL 1188469, at *4 (N.D. Ga.

Apr. 18, 2025).

In *Alliance for Retired Americans v. Bessent*, the court interpreted the Supreme Court's decision in *Kirtz* to conclude that "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." __ F. Supp. 3d __, 2025 WL 740401, at *19. *Kirtz* itself cited a "strong presumption" that "federal statutes touching on the same topic . . . can coexist harmoniously," and a there is a "heavy burden" on a party contending that one statute (here, the Privacy Act) "displaces" another (here, the APA). *Kirtz*, 601 U.S. at 63. That burden is not met here. *See Parra Rodriguez*, 2025 WL 1284722, at *6 ("The Supreme Court's reference [in *Doe v. Chao*, 540 U.S. 614 (2004)] to the Privacy Act incorporating the APA's equitable relief standard of proof supports the inference that the two statutes 'coexist harmoniously' rather than conflict. . . . Defendants have not met the 'heavy burden' of showing that the Privacy Act displaces the APA.").

This conclusion is also in line with the decisions of courts noting that the Privacy Act does not provide relief to individuals in Plaintiffs' circumstances. *See Liu*, 2025 WL 1233892, at *8; *Jane Doe 1*, No. 1:25-cv-01998, D.E. 43, at 20-21. Notwithstanding that Plaintiffs are not considered "individuals" that can bring suit under the Privacy Act, 5 U.S.C. § 552a(a)(2), courts have found that similarly situated plaintiffs' APA claims do not seek "to correct a factual error in [their] SEVIS record[s] such that [their] claim[s] could potentially implicate the Privacy Act." *Liu*, 2025 WL 1233892, at *8. Rather, they are "based on the allegation that [the] SEVIS record accurately reflects that DHS unlawfully terminated [their] F-1 student status." *Id.* "In other words, it is DHS's termination of . . . F-1 student status, as that action is manifested in the SEVIS database" that is challenged, which makes the Privacy Act "irrelevant" to Plaintiffs' claims. *Id.*; *see Jane Doe 1*, No. 1:25-cv-01998, D.E. 43, at 21 (plaintiffs' "allegations challenging DHS's

action go well beyond seeking to correct a record that is 'inaccurate, irrelevant, untimely or incomplete.'  Plaintiffs are instead challenging the decision that led to the unlawful termination of their SEVIS records."  (quoting 5 U.S.C. § 552a(d)(2)(B))).  The Court is satisfied that Defendants' Privacy Act argument fails.

### B.  Whether Plaintiffs will be Irreparably Harmed Absent an Injunction

The harm supporting this second gateway factor must be "more likely than not" to occur absent an injunction, *Reilly*, 858 F.2d at 179, and that is the case here.  By the time of the May 7 hearing, the parties' harm arguments focused on the effects of the facts as they then appeared: Plaintiffs' SEVIS records had been restored with retroactive effect, but the records continued to reflect a prior termination based on a criminal records check and/or revoked visa.  Notations about retroactivity were made, but only viewable by SEVP users and no others, including Plaintiffs' DSOs.

Defendants took the position that "there is no need to extend the current restraints" because Plaintiffs "have not met their burden of establishing continuing irreparable harm" (May 7, 2025 Hearing Tr. at 42:4-7), and the Watson Declaration claimed that "ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the NCIC record that led to its initial termination" (D.E. 38, at 3-4, Watson Decl. ¶ 6).

Plaintiffs countered that this representation was "unsatisfying" and "not very comforting," and that even accepting *arguendo*, and without having yet had the opportunity to cross-examine Hicks' representation about the immutability of the records' event history or otherwise probe the system's technological capabilities, the "single most significant harm" was one they are continuing to face: their SEVIS records still identify them as having been terminated based on identification in a criminal records check.  (May 7, 2025 Hearing Tr. at

28:3-5, 21:18-21, 22:3-6.)  This, despite their involvement in the criminal justice system in no

way qualifying for termination of their SEVIS status.

Moreover, Plaintiffs pointed out that the "end users" without access to the SEVIS record

notations about the retroactivity of the restoration could include "other agencies within the

Department of Homeland Security," such as USCIS and Customs and Border Protection

("CBP"), along with the Department of State, and further, that there had been no representation

that the restoration would be communicated to such other of these entities that rely on SEVIS

record information.  (*Id.* at 24:13-26:2.)  Persuasively, Plaintiffs' attorney put it thus:

> But these plaintiffs who are in a situation where their activities are closely
> scrutinized and carefully regulated and who will be in a position where they may
> have to exist and enter the country, whether they have to get other jobs, where
> they will, in some cases, seek other types of visas such as H visas, which would
> permit them to work, they will have on their record – and the government is
> refusing to delete, essentially, the most damaging piece of information. . . .  [W]e
> know for sure that SEVIS records are looked at by government entities that are
> involved in determining our clients' immigration status, including the validity of
> their visas.  And that, at the end of the day, is what's most critical for us.  The
> idea that some of the notations are only inward facing and not outward facing is
> also troubling because we have clients who want to apply for jobs.  And if
> someone gets ahold of the SEVIS record it's going to show criminality where
> that's not correct.

(May 7, 2025 Hearing Tr. at 22:16-23, 23:21-24:1-5.)  The Goss Declaration supplies the context

for these concerns (D.E. 29, Goss Decl. ¶ 10, noting the "multiple U.S. departmental and agency

touchpoints" involved in F-1 student status): changes of status plus international travel require a

new visa for entry, which involves the Department of State.  Derogatory information in SEVIS

records, such as a prior termination based on a criminal records check or visa revocation, will

likely trigger scrutiny by CBP on a person's arrival at a port of entry, and the information can be

accessed by other agencies as well, and, according to Goss, "[t]here is every reason to believe" it

will cause Plaintiffs to be flagged in future dealings with them given the nature of what was

reported.  Plaintiffs' gap in employment and academic attendance during termination puts them

on a path toward ineligibility for OPT.  A "failure to maintain status" notation can make it

"difficult or impossible" to later get a green card.  (*Id.* ¶¶ 9, 14, 21, 23.)  Plaintiffs' declarations

show how the interaction of these "touchpoints" and the remaining record notations are brought

to bear specifically on them, in ways are ongoing and cannot be fixed at the end of the case.[6]

The negative impact of the remaining notations in Plaintiffs' record is exacerbated by the

extraordinary way in which they came about, as attested to by Goss, who "know[s] of no prior

situation in which SEVP terminated a SEVIS record based on any interaction with law

enforcement."  (D.E. 29, Goss Decl. ¶ 13; *see also id.* ¶ 15.)  Previously, SEVP would notify the

DSO, who in turn would make the determination whether to terminate; "in the rare instance

where HSI may ask a DSO to terminate, the DSO would not if upon further review there was no

violation."  (*Id.* ¶ 13.)  In contrast, the events here, where ICE "forced [the] record termination"

of not just one record, but hundreds, was "unprecedented," and *how* it did that—by acting "in

place of a DSO, using the termination dropdown menu available to DSOs" and based on grounds

---

[6] (*See* D.E. 30, ("Doe #1 Second Decl.") ¶¶ 8, 13 (student is concerned that USCIS will deny upcoming OPT extension request and that their current OPT employer will deem it "too uncertain and risky" to continue their employment due to the notations); D.E. 30-1, ("Doe #2 Second Decl.") ¶ 7 (student is "extremely fearful" CBP will deny re-entry "now that my SEVIS record has a termination period with a notation that I have a criminal record"); D.E. 30-2, ("Doe #3 Second Decl.") ¶¶ 14, 16 (student is concerned they will be denied re-entry, a student visa, or OPT because of the notations); D.E. 30-3, ("Doe #4 Second Decl.") ¶¶ 7, 9 (student has not returned to crucial lab work and was told not to attend class while their record was terminated, now must repeat onboarding and is unsure if they will be able to defend their thesis in August 2025); D.E. 30-4, ("Doe #5 Second Decl.") ¶¶ 9-10 (student is "fearful of exiting and re-entering the United States," anticipating problems re-entering the country); D.E. 30-5, ("Doe #6 Second Decl.") ¶¶ 12-14 (student is uncertain whether OPT or CPT or access to jobs in field will be available "now that I have a termination in my record, especially since it notes that I was identified in a criminal records check"; lacks clarity about whether period of termination constituted an "illegal stay"; concerned about risk of detention that inhibits even domestic travel).)

that are not available for it to use under the applicable regulations, represented a "significant shift in behavior." (*Id.* ¶¶ 16-17.) The unusual nature of this action appears to have prompted a targeting of certain individuals, as suggested by Student Doe #3's statements that, "[w]hen the news broke about international students' SEVIS records being terminated," the reactions caused plaintiff to be "very afraid for my safety" and take steps toward monitoring the home; additionally on a social media platform, plaintiff was "specifically called . . . out" as having been terminated, prompting "hundreds of comments [on the post], some of which were quite hostile." (D.E. 30-2, Student Doe #3 Second Decl. ¶¶ 7-8.)

Defendants' submissions fail to undercut the record of ongoing and irreparable harm that Plaintiffs have marshaled. The Young Declaration, which Defendants filed after the hearing, addresses only one "touchpoint"—USCIS—and wavers on the one potentially relevant assurance to the harms Plaintiffs have cited—that USCIS would not "per se" consider a prior SEVIS record termination/reactivation negatively in adjudicating "an immigration benefit request." (D.E. 38, at 6-7, Young Decl. ¶ 11.) There is tension between the Watson and Hicks Declarations as to what can and cannot be done by way of putting notations into a SEVIS record,[7] but even assuming notations can be made, there is nothing showing that other users outside SEVP, such as the agencies and other governmental entities discussed above, are made aware of them or are bound to that updated, accurate version of events.

Defendants' briefed arguments fare no better. Plaintiffs' harm is neither speculative nor limited to the potential of removal. Nor is it merely monetary harm, which in any event

---

[7] *Compare* D.E. 35, Hicks Decl. ¶ 4 (when "specifically annotated on a court's order, SEVP adds a notation . . . indicating that the record has been restored retroactively to the original date of termination") *with* D.E. 38, at 3-4, Watson Decl. ¶ 7 ("ICE's reactivation . . . is being made retroactive to the date of its initial termination such that there is no gap in the plaintiff(s)' SEVIS record.").

Plaintiffs have argued is neither sufficient nor available in this action. The approximately 20 days that Plaintiffs' SEVIS records were terminated disrupted their academic studies and ability to successfully complete their PhD degrees, and the fallout from those repercussions continues.[8] Moreover, the "loss of timely academic progress alone" has been held to be sufficient irreparable harm," *Jane Doe 1*, No. 1:25-cv-01998, D.E. 43, at 26, as has Plaintiffs' "anxiety and fear, as well as the disruption that detention and deportation pose to their personal, academic, and professional pursuits constitute irreparable harm," *Du v. United States Dep't of Homeland Sec.*, No. 3:25-cv-644, 2025 WL 1220254, at *4 (D. Conn. Apr. 28, 2025), concerns expressed consistently in these Plaintiffs' submissions.[9]

### C. Whether the Harm to Defendants from an Injunction is Greater than the Harm to Plaintiffs Without One, and Whether the Public Interest Favors Granting Injunctive Relief

As noted earlier, the third and fourth factors merge where the government is the opposing party. *Nken*, 556 U.S. at 435. These factors, in substance, "consider the ramifications of the injunction"—whether the opponent would be more harmed by the granting of the injunction than the movants would be harmed by denying it, and whether granting the injunction "would serve

---

[8] (*See* D.E. 30, Doe #1 Second Decl. ¶¶ 14-15 (cannot plan for the future, despondent, "red flag" to employers if program is not completed), D.E. 30-1, Doe #2 Second Decl. ¶¶ 5-6 (inability to go to lab for 24 days "severely impacted" cancer research, which involves time-sensitive work with mice that was entirely lost); D.E. 30-2, Doe #3 Second Decl. ¶ 13 ("couldn't get on the waitlist to be a Teaching Assistant for next fall because waitlist selection happened during status termination," with professional and financial consequences); D.E. 30-3, Doe #4 Second Decl. ¶¶ 6-11 (lost experiment and must repeat onboarding process; "great financial burden"); D.E. 30-5, Doe #6 Second Decl. ¶ 12 (working with power systems requires background checks and current notations incorrectly imply a criminal record).)

[9] The Court notes too that these Plaintiffs, for all that they are far from home, belong to a community that appeared at the May 7 hearing in support of them.

the public interest." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022) (cleaned up).

 Plaintiffs have amply established the harm that they continue to risk absent an injunction. Defendants have cited separation-of-powers concerns with respect to the administration and enforcement of the immigration laws, and cite the Third Circuit's call for "caution" in applying these two injunctive relief factors when separation-of-powers and federalism concerns are in play. *Del. Sportsmen's Ass'n*, 108 F.4th 205. *See also id.* ("Courts rightly hesitate to interfere with exercises of executive or legislative authority."). But "caution" and "hesitation" do not equate to a bar on judicial review or the Court's exercise of its equitable powers, and here Defendants cannot claim qualifying harm from an injunction that would restrain them from carrying out action in violation of the APA, particularly where they have already changed course. Indeed, the Watson Declaration represents that Defendants are no longer relying on their initiative that led to the initial terminations, so they cannot now argue that they would be harmed if they could not continue such a policy. (D.E. 38, at 3-4, Watson Decl. ¶ 6.)

 Moreover, the public interest favors compliance with the applicable law. *See Student Doe #1*, No. 2:25-cv-2825, D.E. 13, at *6 ("This calculable harm to Plaintiff strongly outweighs any potential harm that may come to Defendant, considering there is no apparent reason why Plaintiff is undeserving of the fruits of their years-long efforts."); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is generally no public interest in the perpetuation of unlawful agency action. . . . To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). On balance, the harm to Plaintiffs absent injunctive relief considerably outweighs

Defendants' harm, if any, in being restrained from imposing further consequences based on their prior, likely unlawful action or seeking to do so again without notice to Plaintiffs.

As a practical matter, when a movant establishes the first two elements—likelihood of success and irreparable injury—"it almost always will be the case that the public interest will favor the [movant]." *Amalgamated*, 39 F.4th at 109 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). That is in fact the case here.

### D. Scope of the Relief

The question remains what relief on an interim basis is appropriate. Plaintiffs' proposal is that the Court direct Defendants to excise the offending language from the SEVIS record as a matter of preliminary relief. (D.E. 23 ¶ 2.) The Hicks Declaration claims that "technical limitations of the SEVIS system" preclude the deletion of "the event history for a given record" from the system, although "[w]hen specifically annotated on a court's order, SEVP adds a notation into the SEVIS record, indicating that the record has been restored retroactively to the original date of the termination." (D.E. 35, Hicks Decl. ¶¶ 3-4.) Again, however, those notations "are not viewable by end-users outside of SEVP, such as [DSOs]," again due to purported "technical limitations." (*Id.* ¶ 4.) The Watson Declaration asserts that "ICE's reactivation of the plaintiff(s) SEVIS record is being made retroactive to the date of its initial termination such that there is no gap in the plaintiff(s)' SEVIS record," and that for plaintiffs engaged in OPT for whom "SEVP also edited the SEVIS record to change the OPT employment authorization end date, the record has been reset to the end date set forth in the [plaintiff's] SEVIS record before its termination." (D.E. 38, at 3-4, Watson Decl. ¶¶ 7, 8.) These sworn statements, read together, suggest that some changes can be made to Plaintiffs' SEVIS records,

but perhaps not to the extent that would fully restore Plaintiffs to the *status quo ex ante*—but also that when courts so order, Defendants may in fact be able to make those changes.

The affiants did not testify and therefore were not subject to further examination that may have explored the bounds of Defendants' capabilities. The parties have not yet engaged in discovery. Therefore, the Court does not have enough information to direct Defendants to make specific changes. The Court does not have the benefit of a factual record establishing that such an order would in fact provide Plaintiffs with assurance that all persons or entities in a position to make decisions based on the information in the SEVIS record—such as other governmental agencies, DSOs, or employers—would be able to view the proper fields.

It is, however, appropriate to require Defendants to do what they have already represented they can do: "add[] a notation into the SEVIS record, indicating that the record has been restored retroactively to the original date of the termination." (D.E. 35, Hicks Decl. ¶ 4.)

It is also appropriate, and indeed necessary to the Court's "ability to see the case through," for Defendants and all others covered by the scope of a Rule 65 preliminary injunction to be restrained from imposing any consequences on Plaintiffs as a result of Defendants' prior termination decision that likely violated the APA—and that includes any consequences that flow from the residual notations connected to that termination decision.

Further, there is enough in this record to suggest that Defendants' impending policy change may affect and exacerbate the above harms, such that further restraints are necessary. *See B K v. Noem*, No. 1:25-cv-419, 2025 WL 1318417, at *10-11 (W.D. Mich. May 7, 2025) (finding "Defendants have not borne their burden of demonstrating that the challenged conduct could not reasonably be expected to recur"). The challenged conduct here is ill-considered, indiscriminate, and likely unlawful use by Defendants of statistical, generalized information

from an outside source, NCIC.  Plaintiffs assert that the challenged conduct is likely to recur (D.E. 28, Pl. Supp. Br., at 20), and Defendants' efforts in the Watson Declaration, and now in the Young Declaration, do not rebut the concern that a sister agency may act to Plaintiffs' detriment. The DHS organizational chart from November 2023 that Defendants have produced (D.E. 38, at 5-7) bears this out.  Representations by Watson and Young likewise demonstrate their interlocked functions and support restraints that offer Plaintiffs an avenue for recourse to the Courts if further action affecting their status arises.

### E.  Security under Fed. R. Civ. P. 65(c)

On the granting of temporary or preliminary injunctive relief, the movant must generally provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  There are "rare" exceptions to this "almost mandatory" requirement, *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 539, 611 (3d Cir. 2024) (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988)), and even the exceptions are "exceptionally narrow" and limited to scenarios in which "the nature of the action necessarily precludes any monetary harm to the defendant," *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).  The purposes animating the bond requirement explain the narrowness of the exceptions: the bond is meant to be a "fund to compensate Defendants" who later turn out to have been wrongfully enjoined and, because the Plaintiffs can lose it in such scenario, being required to post that amount "force[s] [them] to think carefully before accepting interlocutory relief."  *Limetree*, 110 F.4th at 611 (cleaned up).

The record here reflects the "exceptionally narrow circumstances" appropriate for bond waiver.  In *Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991), the Third Circuit

recognized an exception based on the hardship a bond would impose on the applicant and the absence of harm to the restrained party, plus the public interest nature of the litigation; that is, that the movant was seeking to "enforce important federal rights." *Id.* at 219-20. That scenario exists here. Plaintiffs, whose declarations describe their modest means and circumstances even before the recent events, experienced financial consequences from the actions they challenge in this suit seeking to "enforce important federal rights." Conversely, there is no indication in the record that the ordered restraints pose any risk of monetary loss to the government. *Cf. Frank's GMC Truck Ctr.*, 847 F.2d at 103 ("We have held previously that absent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error.").[10] The Court therefore will not require Plaintiffs to post security under Fed. R. Civ. P. 65(c).

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion is GRANTED. IT IS THEREFORE ORDERED that until final judgment is entered in this case, Defendants, their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with the foregoing:

1. Shall not directly or indirectly enforce, implement, or otherwise impose any consequences arising out of Defendants' prior decision to terminate Plaintiffs' SEVIS records or F-1 status.

---

[10] Defendants' request that the Court order Plaintiffs to post security cites a Presidential memorandum directing agencies to do so under Rule 65(c). (D.E. 27, Gov't Opp., at 30.) That memorandum reflects existing law on the posting of injunction bonds.

2. Shall not terminate these Plaintiffs' SEVIS records or F-1 status without providing at least 20 days' notice to Plaintiffs and their counsel so that they may make any appropriate application to the Court.

3. Shall restore Plaintiffs' SEVIS records retroactive to the original date of termination and file a notice of compliance no later than May 16, 2025.

**SO ORDERED** this 8th day of May, 2025.

_s/Katharine S. Hayden_
Katharine S. Hayden, U.S.D.J.